[S.F. No. 22859. In Bank. May 15, 1972.]

JUNE HARMAN, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents.

154

## COUNSEL

John B. Harman for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, Norman Sanford Wolff and Robert A. Kenealey, Deputy City Attorneys, Kopp & Goldstein, Quentin L. Kopp, Thomas M. DiFranco, Walter A. Dold, George S. Youngling, Thomas F. Stack, Hanson, Bridgett, Marcus & Jenkins, Williams J. Bush and Pierce N. Stein for Defendants and Respondents.

Sidney E. Roberts, James K. Haynes and Orrick, Herrington, Rowley & Sutcliffe as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**TOBRINER, J.**—In this taxpayer's suit we are asked to determine if San Francisco may properly sell its vacated streets, burdened with private easements of ingress and egress, for 50 percent of their unencumbered fee value. We hold that, because the value of such easements in all of the city's streets are not uniform, the city's arbitrary reduction of 50 percent of the value of the vacated street in fixing the sales price violates its charter duty to obtain 90 percent of the rationally determined market value of all public property offered for sale.

Pursuant to the authority granted in the Streets and Highways Code and its charter, the City and County of San Francisco may upon petition of abutting landowners vacate a public street and convey the city's interest in such street to the petitioning landowners. After the petition of the landowners

to the board of supervisors describing the purposes for their request and the intended use of the street to be vacated, the city director of property determines the street's appraised value. Upon the landowners' tender of a sum equal to that value, the board of supervisors is authorized to find that the granting of the landowners' petition will serve public convenience and to order the vacation and sale of the street.

In obtaining the appraised value of streets proposed for vacation, the city director of property estimates the value of a fee interest of an area equal to that of the street to be vacated, and he then halves that value to compensate for the continuing private easement of ingress and egress held by an owner whose property abuts the vacated street.

Plaintiff sues as a San Francisco taxpayer to obtain a declaration that the property director's method of obtaining appraised values results in a "gift of public funds" contrary to "the laws, statutes, charters, and ordinances governing such sales and transactions." She alleges that in at least eight sales of former streets the private easements commanded no value, so that the city, in determining the price at which to sell, should not have discounted the value of the fee by 50 percent. Plaintiff also demands that the city receive as damages the differences between the actual value and sale price of the eight street segments conveyed.

Defendants, the city and landowners to whom the city has deeded vacated streets, demurred to plaintiff's complaint for failure to state a cause of action. The superior court, advising plaintiff that her complaint could not be cured by amendment, sustained defendants' demurrers without leave to amend. Plaintiff then prosecuted this appeal from a judgment of dismissal.

We hold that plaintiff has stated a valid cause of action, and that the judgment must be reversed with directions to overrule the demurrers. As we shall explain, plaintiff's status as a taxpayer qualifies her to raise the justiciable question of whether the city has violated a statutory duty in its alienation of formerly public streets. Resolving that question, we determine that a charter provision requires the city to obtain 90 percent of the market value of the street property that it sells. The city's practice of evaluating all easements of ingress and egress at 50 percent of the unencumbered fee value cannot stand, since each easement's value must necessarily vary according to the highest and best use of the dominant parcels that abut each street.

1. *Plaintiff's complaint states a cause of action.*

We meet at the outset defendant's contention that plaintiff's complaint does not state a cause of action and fails for lack of specificity. ■ We

explain that a complaint is not vulnerable to a general demurrer if the complaint states the essential and substantial facts to apprise defendant of the nature of the cause of action.

We said in *Rannard* v. *Lockheed Aircraft Corp.* (1945) 26 Cal.2d 149, 156-157 [157 P.2d 1] that " '[a]ll that is required of a plaintiff, as a matter of pleading, even as against a special demurrer, is that his complaint set forth the *essential facts* of the case with reasonable precision and with sufficient particularity to acquaint the defendant with the nature, source and extent of his cause of action' " (italics added). Similarly, in *Krug* v. *Meeham* (1952) 109 Cal.App.2d 274, 277 [240 P.2d 732], the court suggested that averment of the "substantial facts" that constituted a cause of action would suffice to dispel a general demurrer.

*Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137] establishes the principle that no more is required than a showing that plaintiff is entitled to *some relief,* stating, " 'If upon a consideration of all the facts stated it appears that the plaintiff is enitled to any relief at the hands of the court against the defendants, the complaint will be held good, although the facts may not be clearly stated, . . . or although the plaintiff may demand relief to which he is not entitled under the facts alleged.' " (See also *Gressley* v. *Williams* (1961) 193 Cal.App.2d 636, 639 [14 Cal.Rptr. 496]; *Terry Trading Corp.* v. *Barsky* (1930) 210 Cal. 428, 438 [292 P. 474].)

Indeed, a general demurrer to a complaint should not be sustained without leave to amend if the complaint raises the reasonable possibility that its defects can be cured by amendment. Thus the court in *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659, 664 [297 P.2d 638], explains: "In the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his complaint, and it ordinarily constitutes an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment." (See also *Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 739-740 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].) In sum, if the pleadings contain "sufficient particularity and precision to acquaint the defendants with the nature, source and extent of his cause of action" the general demurrer should be overruled. (*Strozier* v. *Williams* (1960) 187 Cal.App.2d 528, 532 [9 Cal.Rptr. 683]; see *Smith* v. *Kern County Land Co.* (1959) 51 Cal.2d 205, 209 [331 P.2d 645].)

Plaintiff at the very least states the essential and substantial facts to apprise the defendants of the nature of her cause of action. Thus plaintiff alleges that the named eight defendants set forth in Exhibit A, the abutting

owners of certain streets, petitioned defendant city to vacate the streets on which their property abutted. In accordance with the provisions of the Street Vacation Act of 1941, the defendant city published notice of intention to vacate these streets. Pursuant to the notices defendant board of supervisors held hearings and thereafter ordered the vacation of those streets. It directed the defendant Dolan, clerk of the board of supervisors, and the defendant Alioto, the mayor, "to execute a document transferring the interest of defendant City to the defendant herein petitioning for vacation and owning the abutting property." These defendants, the abutting owners, "have purchased or acquired or have a right to purchase or acquire from defendant City, and defendant City has sold or agreed to sell or transfer its fee title or other interest" in the described streets.

Turning to the value of the vacated streets, plaintiff alleges that the defendant city and the defendant director of property "have determined the value of each street or portion of a street" and after so doing "gave, granted, and allowed to each person acquiring title to such street or portion thereof from defendant City a sum equal to 50% of the true value thereof to said abutting owners as compensation for rights of ingress and egress over and upon the property vacated and ordered sold." Despite such allowances plaintiff alleges on information and belief "that said rights o[f] ingress and egress were and are of no value to the abutting owners and purchasers." Indeed, each abutting owner "asserted his or its intention to abandon said street or portion thereof as a street and to consolidate it with other properties owned by each of said defendants and abutting owners as a single property." The complaint states that it was the intention of the abutting owner "to exclude the public therefrom and to construct buildings over and upon said properties including said street or portion thereof."

As a result of these transactions, the complaint alleges, "[d]efendant City received no benefit or consideration from allowance of 50% of said value for alleged rights of ingress and egress, . . . but was deprived of the true and reasonable value of such property so transferred . . . ." Finally, the complaint asserts that the aforementioned transactions were "all contrary to the best interests of defendant City, plaintiff, and each taxpayer of the City and County of San Francisco, constituting a gift of public funds, which is contrary to the Constitution of the State of California, the laws, statutes, charters, and ordinances governing such sales and transfers."

■ These allegations contain the substance of plaintiff's purported cause of action that the city violated a statutory duty owed to its taxpayers. Although the complaint may not have been "artfully drawn," it nonetheless alleged the essential and substantial facts to apprise defendants of the nature

of the cause of action. These allegations established the claimed violation of the city charter. On the basis of these allegations the defendants could prepare to, and did in fact, contest the validity of plaintiff's claim. Accordingly, the superior court improperly sustained the demurrers without leave to amend.

We proceed to the central question: whether or not the specific facts alleged in plaintiff's complaint describe unlawful activity against which she is entitled to relief. We explain, first, that plaintiff may properly assert her standing to raise the stated justiciable issue in this court.

2. *Plaintiff presents a cognizable complaint in alleging violation of a statutory standard.*

■ The propriety of a private person's judicial challenge to legislative or executive acts depends upon the fitness of the person to raise an issue ("standing") and the amenability of the issue raised to judicial redress ("justiciability"). (*Flast* v. *Cohen* (1968) 392 U.S. 83, 91-103 [20 L.Ed.2d 947, 956-964, 88 S.Ct. 1942]; Davis, *Standing to Challenge Governmental Actions* (1955) 39 Minn.L.Rev. 353, 391; Jaffe, *Standing to Secure Judicial Review: Private Actions* (1961) 75 Harv.L.Rev. 255, 304-305.)

*Standing*

■ "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a . . . court, and not in the issues he wishes to have adjudicated." (*Flast* v. *Cohen, supra,* at p. 99 [20 L.E.2d at p. 961].) ■ A party enjoys standing to bring his complaint into court if his stake in the resolution of that complaint assumes the proportions necessary to ensure that he will vigorously present his case. (*Baker* v. *Carr* (1962) 369 U.S. 186, 204 [7 L.Ed.2d 663, 678, 82 S.Ct. 691].) As Professor Jaffe has stated, we must determine standing by a measure of the "intensity of the plaintiff's claim to justice." (Jaffe, *supra,* 75 Harv.L.Rev. at p. 304.)

■ Plaintiff, as a municipal taxpayer seeking to avoid the waste of municipal assets, falls into the category of a type of claimant long recognized to possess a sufficiently intense interest in his claim to establish his "standing" to enter the courtroom. Because a successful attack on wrongful municipal spending or disposition of assets in all likelihood may reduce the municipal taxpayer's burden of meeting the expenses of government, courts do not doubt that a municipal taxpayer will effectively present his claim. "[T]axpayers have a sufficiently personal interest in the illegal expenditure of funds by [municipal] officials to become dedicated adver-

saries." (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 270 [96 Cal.Rptr. 42, 486 P.2d 1242]; accord, *Flast* v. *Cohen, supra,* 392 U.S. at p. 93 [20 L.Ed.2d at pp. 957-958]; *Frothingham* v. *Mellon* (1923) 262 U.S. 447, 486-487 [67 L.Ed. 1078, 1084-1085, 43 S.Ct. 597]; *Midwest Employers Council, Inc.* v. *City of Omaha* (1964) 177 Neb. 877 [131 N.W.2d 609, 613]; see also 18 McQuillin, Municipal Corporations (3d ed. 1963) § 52.14, at p. 30; Jaffe, Judicial Control of Administrative Action (1965) pp. 483-484.)

In recognition of this interest, the Code of Civil Procedure provides that any taxpayer of one year's standing may bring an "action to obtain a judgment, *restraining and preventing* any illegal expenditure of, waste of, or injury to" the assets of his municipality. (Code Civ. Proc., § 526a (italics added).) If plaintiff in the instant case sought merely to obtain injunctive relief, this provision would suffice to establish her standing. Because plaintiff also seeks to obtain damages in behalf of the city, however, her interest in the outcome does not diminish. Accordingly, plaintiff's interest as a taxpayer in the outcome of the instant case establishes her standing to seek both equitable and legal relief against the city's allegedly wrongful disposition of its assets.[1]

*Justiciability*

Having determined that plaintiff's interest in her complaint suffices for her to present the issues it contains, we must then determine if those issues raise questions amenable to judicial redress.

 "A taxpayer may sue a governmental body in a representative capacity in cases involving fraud, collusion, ultra vires, or failure on the part of the governmental body to perform a duty specifically enjoined." (*Gogerty* v. *Coachella Valley Junior College Dist.* (1962) 57 Cal.2d 727, 730 [21 Cal.Rptr. 806, 371 P.2d 582].)[2] This well-established rule ensures that the California courts, by entertaining only those taxpayers' suits that seek to measure governmental performance against a legal

---

[1]This expansive interpretation of the taxpayer's standing described in Code of Civil Procedure section 526a supports that section's primary purpose to " 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.' " (*Blair* v. *Pitchess, supra,* 5 Cal.3d at pp. 267-268, quoting from Comment, *Taxpayers' Suits: A Survey and Summary* (1960) 69 Yale L.J. 895, 904.)

[2]See also *Irwin* v. *City of Manhattan Beach* (1966) 65 Cal.2d 13, 24 [51 Cal.Rptr. 881, 415 P.2d 769]; *Wehrle* v. *Board of W. & P. Commrs.* (1930) 211 Cal. 70, 72-73 [293 P. 67]; but cf. *Silver* v. *City of Los Angeles* (1961) 57 Cal.2d 39 [17 Cal.Rptr. 379, 366 P.2d 651], certiorari denied (1962) 369 U.S. 873 [8 L.Ed.2d 276, 82 S.Ct. 1143] (holding municipality not bound by statutory duty of trustees in its administration of public trust).

standard, do not trespass into the domain of legislative or executive discretion. (*Amer. Distl. Co.* v. *City Council, Sausalito* (1950) 34 Cal.2d 660, 664-665 [212 P.2d 704, 18 A.L.R.2d 1247]; *Nickerson* v. *San Bernardino* (1918) 179 Cal. 518, 522-523 [177 P. 465]; accord, *Flast* v. *Cohen, supra,* 392 U.S. at pp. 102-106 [20 L.Ed.2d at pp. 963-965]; see Jaffe, Judicial Control of Administrative Actions, *supra,* at pp. 485-486.) This rule similarly serves to prevent the courts from hearing complaints which seek relief that the courts cannot effectively render; the courts cannot formulate decrees that involve the exercise of indefinable discretion; their decrees can only restrict conduct that can be tested against legal standards. (*San Ysidro Irr. Dist.* v. *Superior Court* (1961) 56 Cal.2d 708, 719-720 [16 Cal.Rptr. 609, 365 P.2d 753]; Jaffe, Judicial Control of Administrative Action, *supra,* at p. 481; Jaffe, *supra,* 75 Harv.L.Rev. at p. 304.) Accordingly, we employ the *Gogerty* rule to determine justiciability of the plaintiff's complaint. (See *Flast* v. *Cohen, supra,* 392 U.S. at p. 95 [20 L.Ed.2d at p. 959].)

██ Plaintiff alleges that the city has violated charter provisions delineating the city's duties in its appraisal and disposition of vacated streets. By asserting "a failure on the part of the governmental body to perform a duty specifically enjoined" (*Gogerty* v. *Coachella Valley Junior College Dist., supra,* 57 Cal.2d at p. 730), plaintiff presents a justiciable complaint. Accordingly, we now proceed to examine the statutory restrictions binding the city in its sales of vacated city streets.

3. *The city owed a statutory duty to its taxpayers to obtain at least 90 percent of a rationally determined market value of vacated streets conveyed to abutting landowners.*

██ We shall point out that the sale of public streets of San Francisco is governed by its charter and not, as some defendants urge, by the Streets and Highways Code. Article XI, section 3, subdivision (a) of the State Constitution provides that upon the voters' ratification and the Legislature's approval of a city and county charter, the charter shall become effective and "supersede . . . all laws inconsistent therewith." ██ Thus the charter represents the supreme law of the City and County of San Francisco, subject, of course, to conflicting provisions in the United States and California Constitutions, and to preemptive state law. (*City of Grass Valley* v. *Walkinshaw* (1949) 34 Cal.2d 595, 598-599 [212 P.2d 894]; *People* v. *McGennis* (1966) 244 Cal.App.2d 527, 532-533 [53 Cal.Rptr. 215]; see *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 135 [98 Cal.Rptr. 281, 490 P.2d 793]; *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137].)

Certain defendants in the instant case, however, contend that specified sections of the Streets and Highways Code preempt the authority of the municipality pertaining to the sale of vacated streets. The relevant provisions in the Streets and Highways Code that these defendants invoke are section 8300 and those following it as well as section 960.4. Reviewing the body of law concerned with vacated streets, we find that the Legislature with good reason has reposed the regulation of the *sale* of such streets exclusively with the municipalities.

Under the first-mentioned sections (Sts. & Hy. Code, § 8300 et seq.) the Street Vacation Act of 1941, a city council may order vacation of a public street (§ 8320), provided that certain publication and hearing procedures are followed (§§ 8322, 8323) and that the city council finds that the street "is unnecessary for present or prospective public street purposes"[3] (§ 8323). The act contains no reference or requirements relating to the determination of the sales price of streets so vacated.

The act thus reveals no legislative intent to occupy the field of the fixing of the terms of sale of vacated streets, but rather creates a set of procedural safeguards to govern the city's vacation of its streets. The Legislature thus manifests its intention to protect a statewide interest in public *access* to dedicated streets (*People* v. *City of Oakland* (1929) 96 Cal.App. 488, 496-497 [274 P. 438]), but to repose in the cities the power to establish protections for their local economic and property interests in such streets. (See *Armas* v. *City of Oakland* (1960) 183 Cal.App.2d 137, 139-140 [6 Cal.Rptr. 750].)

 As we have pointed out, defendants refer secondly to Streets and Highways Code section 960.4. That section authorizes a county board of supervisors to sell property no longer required for street purposes "in the manner and upon the terms and conditions approved by the board. . . ." Since San Francisco comprises a county as well as a city, this section empowers its board of supervisors to fix the terms and conditions of the sale of vacated streets.

---

[3]In the instant case, plaintiff does not challenge the city's decision to *vacate* the streets pursuant to the Street Vacation Act of 1941. Hence we are not called upon under section 8323 to determine that the city properly found the streets "unnecessary for present or prospective public street purposes." Similarly, we are not called upon to examine the vacations for evidence of fraud or collusion, or to find whether the vacation was required by public interest or necessity and was not effected merely for the benefit of adjoining private owners. (See *Beals* v. *City of Los Angeles* (1943) 23 Cal.2d 381, 386 [144 P.2d 839]; *Ratchford* v. *County of Sonoma* (1972) 22 Cal. App.3d 1056, 1073-1077 [99 Cal.Rptr. 887]; *People* v. *Oakland* (1929) 96 Cal.App. 488 [274 P. 438]; cf. San Francisco City Charter, § 92.)

The Legislature thus indicates no intention in this section to occupy the field of alienating vacated public streets but instead recognizes that the local interest prevails and that the disposition of street property be transacted in a manner approved by the county. Hence the county charter provision prescribing such manner of disposition fixes the terms and conditions upon which streets may be vacated and sold. (Cal. Const., art. XI, § 3, subd. (a); *City of Grass Valley* v. *Walkinshaw, supra,* 34 Cal.2d at pp. 598-599; *City of Redwood City* v. *Moore* (1965) 231 Cal.App.2d 563, 573 [42 Cal.Rptr. 72].) Furthermore, since the code also declares that "the authority conferred upon boards of supervisors by [section 960.4] shall be exercised subject to such limitations and restrictions as are prescribed by this division or by other provisions of law" (§ 900), the Legislature presumptively included local *"laws,"* recognizing that in its disposition of street property the board of supervisors should exercise its authority in accordance with municipal legislation.[4]

Finally, we find no policy reasons to support a statewide preemption of the subject matter of the method of fixing the value and sales price of public streets previously vacated. Surely the Legislature recognized that citizens of the state in general shared an interest in the continued public access to city streets, and therefore that uniform requirements as to notices and hearings pertaining to the vacation of such streets should serve as basic statewide safeguards against arbitrary abandonment. No similar interest, however, compelled procedural uniformity with respect to the

---

[4]Moreover, San Francisco City Charter section 107 does not, as amicus suggests, require that Streets and Highways Code section 960.4 prevail over local law. Section 107 provides that "[w]here a procedure for the exercising of any rights and powers belong to a city, or a county, or a city and a county, relative to the . . . *vacating, . . . or otherwise improving streets and highways . . . and the payment of damages, or levying of special assessment to defray the whole or part of the cost of such works or improvements is provided by statute of the State of California,* such procedure shall control and be followed, unless a different procedure is provided in or under authority of this charter . . . ." (Italics added.) Hence this section applies only to street vacations *whose costs have been provided by state legislation,* and only if another provision of the charter does not govern the meeting of such costs.

The instant case involves not the procedure of street vacations, but that of the sale of streets which have already been vacated. Section 107, concerned with the assessment of the *costs* of public works improvements, thus does not apply to the *sale* of such improvements. (See *Kennedy* v. *Ross* (1946) 28 Cal.2d 569, 580 [170 P.2d 904].) Moreover, we note that Streets and Highways Code sections 960.4 and 8300 and following, which amicus cites to demonstrate that the state had adopted an alternative street vacation procedure, do not provide for meeting the *costs* of street vacations. In the absence of costs provisions in the statutes dealing with street vacations, section 107 by its terms cannot preclude the application of other charter sections.

For these reasons, no doubt, the city itself has at no time contended that section 107 governs its sales of public streets.

sales price of streets previously vacated. To the contrary, the interest in preventing fiscal waste in the disposition of municipal assets is obviously one of local concern.

In sum, neither the wording of the statutes nor the nature of the field of regulation preempts local authority to regulate the sale of municipal streets. In consonance with the California statutes "other procedures may be adopted either independently or concurrently. Especially is this true where a statutory method of procedure is incomplete, or inadequate" to protect local interests. (11 McQuillan, Municipal Corporations (3d ed. 1964) § 30.196, at p. 144, citing *Armas* v. *City of Oakland, supra,* 183 Cal.App.2d 137.) Since the Legislature has relegated to the municipalities the responsibility to protect against improper terms of sale of public streets, we must look to the relevant municipal enactments for the standards governing the instant case.

Turning, then, to the supreme municipal law of San Francisco, the charter, we find the following provision relating to the sale of city property: "Section 92. Any real property owned by the city and county, excepting lands for parks and squares, may be sold on the recommendation of the officer, board or commission in charge of the department responsible for the administration of such property. When the board of supervisors, by ordinance, may authorize such sale and determine that the public interest or necessity demands, or will not be inconvenienced by such sale, the director of property shall make a preliminary appraisal of the value of such property. The director of property shall advertise by publication the time and place of such proposed sale. He shall forthwith report to the department head concerned and to the supervisors the amount of any and all tenders received by him. The supervisors may authorize the acceptance of the highest and best tender, or they may, by ordinance, direct that such property be sold at public auction, date of which shall be fixed in the ordinance. No sale other than a sale at public auction shall be authorized by the supervisors unless the sum offered shall be at least ninety percent of the preliminary appraisal of such property hereinbefore referred to."

This section, requiring sales of city property at 90 percent of a "preliminary appraisal" value when the property is not sold at auction, serves a fundamental purpose: it enjoins the city from the waste of assets which have been obtained or maintained at public expense. By their ratification of this section the citizens of San Francisco obviously sought to prevent the enrichment of individual private purchasers who in a noncompetitive sale would obtain city assets at less than fair value.

In order to fulfill the charter purpose of avoiding sales that result

in public waste, the "preliminary appraisal" of property offered for a noncompetitive sale must represent a rational assessment of the property's market value. Otherwise, the director, by appraising the property at lower than market value, could sanction a sale of city assets at a price that subsidized the purchaser at public expense. Clearly the draftsman of section 92 did not intend to give the director of property a latitude that would destroy the protective armor of the section.[5]

"Market value" has consistently been defined as " 'the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adopted and for which it was capable' " (*Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 488 [93 Cal.Rptr. 833, 481 P.2d 1]; *Sacramento etc. R.R.Co.* v. *Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979]). ▆ We conclude that section 92 requires the city, when selling vacated streets to abutting owners, to obtain in exchange at least 90 percent of a rational assessment of that value.[6]

4. *Plaintiff's complaint that the city violated its statutory duty to obtain at least 90 percent of a rationally determined market value of vacated streets conveyed to abutting landowners states a valid cause of action.*

We now proceed to evaluate the merits of plaintiff's cause of action. ▆ Accepting the complaint's factual allegations as true, as we must for purposes of evaluating plaintiff's appeal from a sustained demurrer

---

[5]The rationale of city charter section 91, requiring the director of property to perform "preliminary appraisal of [real] property sought to be condemned or otherwise acquired, and report thereon to the responsible officer," similarly demands that the "preliminary appraisal" conform to market value. Since the appraisal requirement obviously serves to facilitate the city's calculation of the costs of proposed municipal improvements, the appraisal must represent the director's best estimate of the *actual costs* of acquiring real property required by such improvements. Otherwise, if the director enjoyed discretion to provide an appraisal at other than market value, his function in the city's planning process would become at best meaningless and at worst disruptive.

[6]Nonetheless, contends amicus, even if section 92 does pertain to this action, 90 percent of preliminary appraised value need not be realized when the city *exchanges* vacated streets for other property. This contention lacks merit. Although section 92 declares that "[t]he director of property may, in lieu of sale, arrange for the trading of any real property proposed to be sold for other property required by the department in charge thereof," that section's basic purpose of avoiding disposition of public streets for inadequate compensation permits no distinction in the value required to be realized in an exchange of property for cash and an exchange of property for property. The basic rule governing sales must also apply to exchanges; the market value of property received in exchange must equal at least 90 percent of the market value of the property disposed.

(*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732]), we note that the city "gave, granted and allowed to each person acquiring title to such street or portions thereof from defendant city a sum equal to 50% of the true value thereof to said abutting owners as compensation for rights of ingress and egress over and upon the property vacated and ordered sold." In short, plaintiff complains that the city has appraised and sold the streets to abutting landowners at 50 percent of their true value.[7] Plaintiff further alleges that these sales are "contrary" to the city charter, an allegation which raises the issue of whether the streets were sold at a price at least equal to 90 percent of a rational assessment of market value.

In response, the city asserts that it owns the fee interest in the streets, that the abutting owners hold the easement of ingress and egress, and that these two interests mount an equal value. Hence, concludes the city, the abutting owners, upon purchase of the city's interest, should pay only one half of the street's unencumbered fee value.

▆▆▆ We shall point out that the arbitrary sale of the city's interest in its streets at the fixed fraction of one-half the fee value does not fulfill the charter requirement. This is not a case where cutting the value of the street in two, in some remote semblance of a Solomonic judgment of halving the disputed baby, will at all or invariably compensate the city for the streets it sells.

▆▆▆ Since this case comes to us after the sustaining of a demurrer, the city cannot now contend that *in fact* the questioned sales *did* take place at prices within 10 percent of market value; such a contention would raise merely an issue of fact not cognizable on this appeal. (*Ferraris* v. *Levy* (1963) 223 Cal.App.2d 408, 412 [36 Cal.Rptr. 30]; *County of San Mateo* v. *Bartole* (1960) 184 Cal.App.2d 422, 435 [7 Cal.Rptr. 569]; see Code Civ. Proc., § 589.) If the city is to prove that plaintiff has not stated a valid cause of action it must show that *as a matter of law* its system of appraisal yields *in all instances* sale prices in conformity with charter requirements; in other words, that *as a matter of law* all easements of ingress and egress to streets have the *same value,* and that in all such cases that value approximates *50 percent* of the value of an unencumbered fee interest in that street.[8]

---

[7]We note that plaintiff's allegation that the city invariably appraises and sells vacated streets at 50 percent of the street's fee value is not only presumed true for the purpose of ruling on defendants' demurrers, but has been admitted to be true by defendant city's answer to interrogatories.

[8]Plaintiff alleges that in eight cases the easements have "no value." Her cause of action, however, does not depend on proving the easements' worthlessness, but only on showing that in some specific cases they have so little value that the city's 50

This proposition on its face cannot stand. An examination of established appraisal doctrine will illustrate its fallacy.

■ Defendants correctly contend, of course, that a private easement of ingress and egress burdens all public streets in favor of the abutting parcels (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663 [39 Cal.Rptr. 903, 394 P.2d 719]; *People* v. *Ricciardi* (1943) 23 Cal.2d 390, 397-398 [144 P.2d 799]), and that this easement continues even though the city by vacation terminates the public right of access to the street. (*Neff* v. *Ernst* (1957) 48 Cal.2d 628, 636 [311 P.2d 849]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 349-350 [144 P.2d 818]; *Ratchford* v. *County of Sonoma* (1972) 22 Cal.App.3d 1056, 1069 [99 Cal.Rptr. 887].) So long as the potential for the exercise of the easement remains viable, the easement has value (*Beals* v. *City of Los Angeles* (1943) 23 Cal.2d 381, 388 [144 P.2d 839]), and the servient estate's value will correspondingly decrease. *The diminution in value will not, however, equal half the fee value in every case.*

■ Modern appraisal practice dictates that the value of an easement be determined by comparing the market value of the dominant estates before and after the easement is terminated. "The general rule is that the [value] of access rights is the difference in the market value of the [abutting] property before the taking of the access rights and its market value after the taking, considering its highest and best use. . . . In some cases, 'highest and best use' has been qualified to mean the 'most likely use' over a period of years." (Crawford, *Appraisal of Rights of Way and Easements* in Encyclopedia of Real Estate Appraising (Friedman ed. 1968) pp. 724, 727; see *Symons* v. *San Francisco* (1897) 115 Cal. 555 [42 P. 913, 47 P. 453]; *People* v. *Al. G. Smith Co.* (1948) 86 Cal.App.2d 308, 311 [194 P.2d 750]; see also Hadley, *Legal Problems in Highway Acquisition* in Condemnation Appraisal Practice (Amer. Inst. of Real Estate Appraisers 1961) pp. 179, 191.) Hence an easement of ingress and egress cannot be appraised by treating its underlying fee as if it stood in a vacuum; the appraiser must look to the status of the surrounding parcels (see *Delta Rent-A-Car Systems, Inc.* v. *City of Beverly Hills* (1969) 1 Cal.App.3d 781, 786 [82 Cal.Rptr. 318]; *People* v. *Murray* (1959) 172 Cal.App.2d 219, 225-227 [342 P.2d 485]), and determine the easement's value in the context of the abutting parcels' highest and best use.

Not all parcels that abut the city's vacated streets will have the same highest and best use. If the abutting lots are located in a residential area,

percent rule of thumb leads to sales prices for the encumbered fee of less than 90 percent of market value.

their highest and best use will probably contemplate the development of one residence on each parcel. But the highest and best use of abutting lots in a commercial zone might be as a unified tract that permits construction of a large building covering all the lots and the vacated street as well.[9]

Given that the highest and best use of parcels abutting vacated streets *will vary* according to their neighborhoods, the easements of ingress and egress will obviously *not have uniform value throughout the city*. In a residential neighborhood, the necessity of maintaining access to lots whose highest and best use demand separate development of each lot will require appraisal of the easement at a high percentage of the street's unencumbered fee value; without the access, or with a diminished access, the abutting parcels would suffer substantial loss in value, and the purchaser of the street could not block that access without correspondingly compensating the other abutting owners. In a commercial environment, however, development of the parcels as the site for a large building will obviate the need for access through the vacated street; access will be provided by other streets bordering the unified tract. Accordingly, in the case of the block-sized tract, the abutting owners' easement will have little or no value; such owners will derive maximum use of the land by combining their lots and the vacated street into a single holding.

The director of property, then, in making a "preliminary appraisal" to determine the price at which the city may sell vacated streets, must recognize and compensate for the *variation in easement values* that result from the divergent "highest and best uses" of the parcels abutting the various streets which the city may sell. In sum, the city cannot as a matter of law establish that an automatic 50 percent allowance must be granted in each and every situation; the city must take cognizance of the variables which will destroy the monistic figure. In the inflexibility of the city's formula lies its indefensibility.

Because the city cannot show as a matter of law that it received 90 percent of a rationally determined market value of the vacated streets described in plaintiff's complaint, plaintiff's allegations that the city failed

---

[9]The determination of the highest and best use of parcels abutting a vacated street forms part of the appraiser's work, calling for a rational exercise of his judgment in each case. In making this determination, the appraiser may, as the above-quoted rule relating to access valuation indicates, base his finding on knowledge of the land's "most likely use." In the case of streets being sold by the city, the abutting owner who offers to buy will provide strong indications of the land's most likely use; as part of his petition for street vacation and sale, he must outline his intended use of the street so that the board of supervisors will have a rational basis on which to find that "the public interest or necessity demands, or will not be inconvenienced by such a sale." (San Francisco City Charter, § 92.)

to fulfill this statutory duty, due to the director of property's practice of appraising every easement of ingress and egress at 50 percent of the street's unencumbered fee value, states a valid cause of action. Accordingly, the superior court erred in sustaining defendants' demurrers without leave to amend.

The judgment is reversed and the cause remanded with directions to overrule the general demurrers and proceed in accordance with this opinion.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.