[Civ. No. 40420. First Dist., Div. Three. Feb. 27, 1978.]

SHORT LINE ASSOCIATES et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Respondent.

COUNSEL

Miller, Starr & Regalia, Edmund L. Regalia and Leslie A. Johnson for Plaintiffs and Appellants.

Thomas M. O'Connor and George Agnost, City Attorneys, and Daniel E. Collins III, Deputy City Attorney, for Defendant and Respondent.

OPINION

**TERRY, J.**\*—Plaintiffs appeal from a portion of the judgment taken against them by the defendant City and County of San Francisco.

The Board of Supervisors of the City and County of San Francisco on April 7, 1965, adopted a resolution that set forth its general objective to substantially improve its principal thoroughfare, Market Street. During the same period the Bay Area Rapid Transit District (BARTD) was proceeding with the construction of its rapid transit system to serve the San Francisco Bay Area. BARTD plans for the San Francisco portion of the regional rapid transit system included a two-level subway beneath Market Street. The lower level would be used by BARTD and the upper level would be used by San Francisco Municipal Railway vehicles previously operated on the Market Street surface. To this end, a joint power agreement was entered into on May 31, 1967 by BARTD and the City and County of San Francisco. The agreement provided for the construction of subway stations that would serve both BARTD and the municipal railway. A major station was to be located near the intersection of Powell, Eddy and Market Streets. In addition to the lower level used by BARTD and the upper level to be used by the municipal railway, this station would also contain a third level mezzanine. This mezzanine was to be used by both rapid transit and local transit patrons to gain access to and exit from their respective transit systems. Surrounding this station on the surface level was a large pedestrian oriented area named in honor of the inventor of the San Francisco cable car, Andrew S. Hallidie Plaza.

A series of resolutions were passed by the board of supervisors authorizing the construction of an extension of Fifth Street (later named Fifth Street North), the construction of a plaza at the intersection of

---

\*Assigned by the Chairperson of the Judicial Council.

Powell, Market and Eddy Streets and in the area between Market and Eddy Streets west of the extension of Fifth Street. Through the exercise of its power of eminent domain the City of San Francisco in 1967 and 1968 gained title to property necessary to complete the project.

Plaintiff Citizens Savings & Loan Association, a California corporation, is the master lessee of certain property known as lot 9 in assessor's block 341 in the City of San Francisco. That property is adjacent to and abutting Hallidie Plaza along the westerly boundary of the plaza. Plaintiff Short Line Associates, a California limited partnership, built an eight-story office building which is now located on lot 9, as sublessee of the property. The appendix attached to this opinion illustrates the location of lot 9 and its relation to Hallidie Plaza.

In September of 1972, plaintiff Short Line submitted to defendant an application for a building permit for construction of an eight-story office building on lot 9. The plans and specifications submitted with the building permit application were in compliance with all applicable building code requirements provided that the user of lot 9 was entitled to access onto that area of Hallidie Plaza between Market and Eddy Streets west of Fifth Street North.

Defendant through its department of public works and department of real estate withheld approval of the building permit on the ground that such a permit could not be issued for construction of the proposed building as designed in that it provided both for windows looking out upon and access to Hallidie Plaza. Defendant asserted that the plans would have to be resubmitted without any windows facing Hallidie Plaza and without any access to Hallidie Plaza or, in the alternative, plaintiff Short Line would be required to purchase easement rights for pedestrian access, air and light upon and over a portion of Hallidie Plaza adjacent to lot 9.

In order to expedite the project, plaintiffs ultimately agreed to pay $225,000 for an easement onto Hallidie Plaza. Defendant in turn enacted an ordinance authorizing the public sale of easement rights for pedestrian access and light and air upon and over the westerly 20 feet of Hallidie Plaza adjacent to lot 9. Plaintiffs purchased the easement under protest, reserving their rights to challenge the propriety of the sale by legal action. On November 2, 1973, plaintiffs filed a claim for money against defendant for the return of $225,000. Upon denial of that claim,

plaintiffs filed in the superior court a complaint consisting of four causes of action. The first cause of action was for rescission of the easement contract. The second cause of action was for determination of the fair market value of the easement rights. The third cause of action was for the return of money had and received and the fourth cause of action was for declaratory relief requesting declaration of the rights of the respective parties to the easement.

Plaintiffs moved for partial summary judgment on the first, third and fourth causes of action. After written and oral argument, on April 22, 1976, the trial court issued an interlocutory judgment and order which held that defendant properly required payment from plaintiffs for the alleged easement rights. Thereafter, a trial was held on the value of the easement rights and on August 25, 1976, judgment was rendered against plaintiffs which judgment incorporated the interlocutory judgment and order. Judgment was entered accordingly on August 30, 1976.

Plaintiffs have appealed from that portion of the judgment consisting of the interlocutory judgment and order. The sole issue on appeal is whether plaintiffs gained rights of ingress and egress and rights to light and air over the 20-foot strip of land adjacent to lot 9 upon the construction of Hallidie Plaza by the City and County of San Francisco. If plaintiffs did not have these rights as an abutting owner, the city by its charter was required to charge plaintiffs for the interest of land granted to them.[1]

If, on the other hand, the 20-foot strip of property abutting lot 9 owned by plaintiffs is the equivalent of a street, the plans submitted on plaintiffs' first application for a building permit were entitled to approval without the necessity of purchasing an easement for access to the abutting 20-foot strip of land. ▆▆ The law in California is well established that: "Every lot fronting upon a street has, as appurtenances thereto, certain private easements in the street, in front of and adjacent to the lot, which easements are a part of the lot, and are private property as fully as the lot itself, though exercised in the street and extending into and over the street. Any obstruction to the use of the street which impairs or destroys these easements is a private injury, special and peculiar to the

---

[1]Charter of the City and County of San Francisco, section 7.401: "Any real property owned by the city and county, excepting lands for parks and squares, may be sold on the recommendation of the officer, board or commission in charge of the department responsible for the administration of such property."

owner of the lot, and different and distinct from the injury to the general public and from that which such owner suffers as a part of the general public. . . . As an abutting owner, he has the right to the private easements in question, . . . .

"These private easements are, — 1. The right of ingress and egress to and from the lot over and by means of the adjacent portion of the street [citations] . . .; 2. The right to receive light from the space occupied by the street, and to the circulation of air therefrom [citations]; and 3. The right to have the street space kept open so that signs or goods displayed in and upon the lot may be seen by the passersby, in order that they may be attracted as customers to patronize the business carried on thereon. [Citations.] The plaintiff, as the owner of the lot abutting on the street, was possessed of these private easements. . . ." (*Williams* v. *Los Angeles Railway Co.* (1907) 150 Cal. 592, 594-595 [89 P. 330].)

Subsequent California case law is in accord. (*Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 167 [101 Cal.Rptr. 880, 496 P.2d 1248]; *Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663 [39 Cal.Rptr. 903, 394 P.2d 719]; *People* v. *Ricciardi* (1943) 23 Cal.2d 390, 397 [144 P.2d 799]; *Rose* v. *State of California* (1942) 19 Cal.2d 713, 727 [123 P.2d 505]; *McCandless* v. *City of Los Angeles* (1931) 214 Cal. 67, 71 [4 P.2d 139]; *Lincoln Savings & Loan Assn.* v. *Title Ins. & Trust Co.* (1975) 46 Cal.App.3d 493, 497 [120 Cal.Rptr. 219].)

These rights are not dependent upon the intent of the political subdivision which constructs the street; rather, they arise as a matter of law when a highway is established, irrespective of the mode by which it is established. (*People* v. *Russell* (1957) 48 Cal.2d 189, 195 [309 P.2d 10]; *Rose* v. *State of California, supra,* 19 Cal.2d 713, 727; Lewis, Eminent Domain (3d ed. 1909) p. 186.) In the instant case, these rights would arise upon the construction of the plaza. (See *Burkett* v. *Board of Supervisors* (1861) 18 Cal. 702; *Pan-Pacific Const. Co.* v. *Meadows* (1927) 85 Cal.App. 775, 779 [260 P. 355].) In *Pan-Pacific,* a mandamus action was brought against the Superintendent of Streets of Hermosa Beach to compel him to repair a pier under a state Street Improvement Act. The Street Improvement Act authorized work necessary to improve a street owned by a city of the class of Hermosa Beach. Accordingly, the question before the court was whether or not the pier was a street. The court's analysis of the question rested not with the name of the thoroughfare, a "pier," but with its function. The court stated: "It is apparent that the test of whether

a structure in the nature of a pier is a street depends primarily upon its location with reference to existing and recognized highways, as well as upon the use to which it is put or is adaptable by the general public." (*Pan-Pacific*, 85 Cal.App. at p. 777.)

Thus, if the 20-foot strip of land abutting plaintiffs' property and forming part of Hallidie Plaza is a street, plaintiffs already had the rights they purchased under protest from the city regardless of the city's intent. Our discussion and decision is confined solely to this strip of land since the remaining components of Hallidie Plaza are not in issue.

Resort may be had to a number of California authorities to determine whether the character of the 20-foot strip of land abutting plaintiffs' lot is equivalent to a street. Among the definitions of "street" are Government Code section 65002 in the planning law which defines a street to include a "walk" and the state Housing Act (former Health & Saf. Code, § 15030, repealed 1961), where a street means a "park, not less than sixteen feet in width." Various definitions of a "street" appear in the Streets and Highways Code, such as "square" and "squares . . . or places" (Sts. & Hy. Code, § 3209 (repealed) and § 4008). In the Pedestrian Mall Act, a street means any public "street, road . . . or place of any nature open to the use of the public" (Sts. & Hy. Code, § 11004). Similarly, Streets and Highways Code section 18004.5 refers to "places and ways dedicated to public use" and section 18311 refers to a street to include alleys and other public places. A "pedestrian mall" is another variation of a street; it is "one or more 'city streets' or portions thereof on which vehicular traffic is or is to be restricted in whole or in part and which is or is to be used exclusively or primarily for pedestrian travel" (Sts. & Hy. Code, § 11006). The Tree Planting Act of 1931, Streets and Highways Code section. 22010 provides: " 'Street' means all or any portion of territory within a city set apart and designated for the use of the public as a thoroughfare for travel, and includes the sidewalk, the center and the side plots thereof."

Case law also establishes that sidewalks are included within the definition of streets. (*Heath* v. *Manson* (1905) 147 Cal. 694, 699 [82 P. 331]; *Marini* v. *Graham* (1885) 67 Cal. 130, 132 [7 P. 442]; *Conjorsky* v. *Murray* (1955) 135 Cal.App.2d 478 [287 P.2d 505]) Broader and more general definitions are found in *B. & H. Transportation Co.* v. *Johnson* (1932) 122 Cal.App. 451, 453 [10 P.2d 506], where the court held that "roads and highways are generic terms embracing all kinds of public

ways . . ." and *Earl* v. *Dutour* (1919) 181 Cal. 58, 60 [183 P. 438, 6 A.L.R. 1163] which holds that a street is territory "set apart and designated for the use of the public." (See also *Watson* v. *Greely* (1924) 69 Cal.App. 643 [232 P. 475].)

The authorities cited above demonstrate that the definition of a street or a sidewalk varies broadly according to the context in which the term is used. There appear to be no statutory or decisional authorities dealing with similar factual situations, that determine what type of thoroughfare should be considered a "street" in the context of creating abutter's rights by operation of law. Thus, this is a case of first impression. An examination of the diagrams, maps and photographs submitted to the trial court is significant in determining the character of the 20-foot strip of land abutting plaintiffs' property. It is exclusively for pedestrian use and connects Market Street with Eddy Street and Fifth Street North. It is the most direct method for pedestrian traffic walking east on Market Street to reach Eddy Street. Similarly, pedestrians walking south on Powell or Fifth Street North and desiring to proceed west on Market would find this a convenient and direct route. The area in question serves the pedestrian traffic on the street surface and is distinguishable from the remaining areas of the Hallidie Plaza that are designed and depicted to serve the transit systems' patrons. The recessed mezzanine level was designed to be used by both municipal railway and BARTD patrons for the purpose of gaining access to and exit from their respective underground transit systems. The character of these facilities is clearly transit oriented as compared to the surface area used generally by all pedestrians. It is therefore clear that the 20-foot strip of property abutting lot 9 owned by plaintiffs is the equivalent of a street for the exclusive use of pedestrians. ■ The defendants have emphasized that only the property comprising Fifth Street North was formally dedicated by the City and County of San Francisco, while plaintiffs contend that the city's actions constituted and implied dedication. However, it is firmly established that an abutting owner's right to access and light and air is distinct from the public's right. While the public's right may depend on and arise by an express or implied dedication, an abutter's right arises by operation of law and is peculiar and individual to the abutting owner. (*People* v. *Russell, supra,* 48 Cal.2d 189, 195; *Rose* v. *State of California, supra,* 19 Cal.2d 713, 727.)

■ The defendant's own acts in the development of Hallidie Plaza support the conclusion that the property in question is a street. The funds

used by defendant for the acquisition of the Hallidie Plaza property were derived from California gas tax revenues received by the City and County of San Francisco in the 1965-1966 fiscal year. At the time the funds were received and used to acquire the Hallidie Plaza property, California Constitution article XXVI, section 1 was in effect. That section provided as follows:

"(a) From and after the effective date of this article, all moneys collected from any tax now or hereafter imposed by the State upon the manufacture, sale, distribution, or use of motor vehicle fuel, for use in motor vehicles upon the public streets and highways over and above the costs of collection, and any refunds authorized by law shall be used exclusively and directly for highway purposes as follows:

"(1) The construction, improvement, repair and maintenance of public streets and highways, whether in incorporated or unincorporated territory, for the payment for property, including but not restricted to rights of way, taken or damaged for such purposes and for administrative costs necessarily incurred in connection with the foregoing. . . ." (Cal. Const., art. XXVI, § 1, adopted Nov. 8, 1938, repealed June 4, 1974.)

Consistent with this provision, defendant by series of resolutions and ordinances authorized the expenditure of gas tax revenues for the acquisition and construction of extension of Fifth Street and Hallidie Plaza. The initial resolution No. 801-65, adopted by the board of supervisors on December 15, 1965, authorized the extension of Fifth Street North from Market Street to O'Farrell Street and the construction of a plaza at the intersection of Powell, Market and Eddy Streets. This was followed by resolution No. 112-66 on February 24, 1966, authorizing construction of a plaza between Market and Eddy Streets west of the proposed extension of Fifth Street. This resolution relates to the area that includes the 20-foot strip abutting plaintiff's property. Ordinance No. 221-67 adopted August 17, 1967 authorized the acquisition of the property necessary to carry out the provisions of resolutions Nos. 801-65 and 112-66 and specifically refers to them in its text. That the construction of the plaza and Fifth Street extension were integral parts of one project is not only demonstrated by the nature of the ordinance and resolutions referred to above, together with the constitutional limitations on the use of gas tax funds, but by the defendant's own orders relating to the project. On October 26, 1965, the Director of Public Works of the City

and County of San Francisco issued order No. 71075 which contained the following paragraph:

"The intersection of Powell, Market and Eddy Streets is now congested and the situation will become much worse when the Powell Street Station of the Market Street subway is put into operation, unless a plaza is provided. *The prime function of the plaza is* to add space to the mezzanine level of the station *to facilitate the heavy movement of transit passengers* both in and about the station. BART estimates anticipate an average daily patronage of 56,400 and the plaza facilities must be large enough *to provide adequate means by which these transit users can be separated from the heavy volume of general pedestrian traffic in the area.*"

Under these circumstances, it is clear that the 20-foot strip of land adjacent to plaintiffs' property was designed and constructed as a public street or way for the exclusive use of pedestrians. Plaintiffs therefore acquired an abutting owner's right to access and light and air as described in *People* v. *Russell, supra,* 48 Cal.2d 189, and *Rose* v. *State of California, supra,* 19 Cal.2d 713.

■ Under these circumstances, the city wrongfully refused to approve plaintiffs' building plans in the form in which they were subsequently approved after the purchase of the easement. Since plaintiffs were deprived of their right to construct the building which now stands on lot 9, unless they purchased the easement, the contract for the easement was entered into under conditions of economic duress. Thus, the contract for the purchase of the easement should be ordered rescinded, and the city ordered to refund the purchase price.[2]

The judgment is reversed and the case remanded with directions to enter judgment in accordance with the views expressed herein.

Scott, Acting P. J., and Feinberg, J., concurred.

A petition for a rehearing was denied March 29, 1978, and respondent's petition for a hearing by the Supreme Court was denied May 18, 1978. Tobriner, J., and Newman, J., were of the opinion that the petition should be granted.

[2]Civil Code, section 1689 provides: "(b) A party to a contract may rescind the contract in the following cases: (1) If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party to whom he rescinds, or of any other party to the contract jointly interested with such party."