[Civ. Nos. 52977, 53695. Second Dist., Div. Three. Oct. 25, 1978.]

ZEE TOYS, INC., et al., Plaintiffs and Respondents, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

[Civ. No. 53306. Second Dist., Div. Three. Oct. 25, 1978.]

SEARS, ROEBUCK & COMPANY, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

## COUNSEL

John H. Larson, County Counsel, and James Dexter Clark, Deputy County Counsel, for Defendants and Appellants.

Baker, Ancel & Redmond, Baker, Ancel, Redmond & Hall, Gerald T. Manpearl, Thomas C. Corcovelos, Jeanne Denise Hansen, Loeb & Loeb, Frank M. Keesling, Andrew S. Garb, Thomas W. Henning, Jones, Hall & Arky and Ann K. Smith for Plaintiffs and Respondents.

## OPINION

**POTTER, Acting P. J.**—These consolidated appeals are from summary judgments in two superior court actions which grant plaintiffs Zee Toys, Inc., and Formosa Plastics Group (U.S.A.), Inc. (Sup. Ct. No. C 179151) and Sears, Roebuck and Co. (Sup.Ct. No. C 191156) refunds of ad valorem taxes paid under protest. In the Zee case, the taxes had been collected for the benefit of defendants County of Los Angeles and City of Long Beach; in the Sears case, the taxes had been collected for the benefit of defendants County of Los Angeles and City of Compton, the city in each case being the situs of the goods taxed.

In both cases, the tax involved was ad valorem taxation levied upon tangible personal property in the possession of plaintiffs stored in warehouses in Los Angeles County on the tax lien dates. Such property had been manufactured outside the United States and brought to this state by the plaintiffs as importers.

The plaintiffs in both actions claimed an exemption from taxation for a percentage of such imported goods in their possession based upon the provisions of Revenue and Taxation Code sections 225 and 225.1. As then in effect, said sections read:

"Personal property manufactured or produced, (1) outside this state and brought into this state for transshipment out of the United States, or (2) outside of the United States and brought into this state for transshipment out of this state, for sale in the ordinary course of trade or business shall be exempt from taxation. The exemption under this section shall not apply to personal property in manufacturing process or production. Such process or production shall not include the breaking in bulk, labeling, packaging, relabeling, or repackaging of such property." (Rev. & Tax. Code, § 225.)

"A person claiming an exemption under Section 225 may either claim this exemption by (1) a percentage method of determining property held for transshipment on hand at a particular location by allocating a portion of the total inventory, using the percentage determined by dividing the total out-of-state shipments by the taxpayer from that location during the preceding year by the total of such shipments from that location during such year, or (2) an actual method as evidenced by contracts of sale on the tax lien date, and a full, true and correct inventory of all property held for transshipment together with the date of receipt of the same, the date of withdrawal of the same, the point of origin thereof, and the point of ultimate destination thereof." (Rev. & Tax. Code, § 225.1.)[1]

The facts bearing upon the exempt status of the property were not in dispute. In the Zee case, the declarations showed that the plaintiffs were wholesale importers and distributors of goods manufactured outside the United States and distributed throughout the United States. Upon importation the goods were unloaded from the means of transportation at the plaintiffs' warehouses. They were then sorted by type and stored as inventory awaiting sale to plaintiffs' wholesale customers. Such inventory was normally "turned over" or replaced four to five times per year. While the goods were so stored, ad valorem property taxes were levied by defendants. Zee claimed that 90 percent of the inventory taxed was exempt and showed by uncontradicted declarations that during the year preceding the lien date, 90 percent of Zee's total shipments from the warehouses were to customers located outside of the State of California

---

[1]The same provisions are now incorporated in Revenue and Taxation Code section 253.10, which was added by Statutes of 1977, chapter 246, section 7.

and 10 percent of such shipments were to customers located inside the State of California. Comparable percentages for Formosa were 63 percent of total shipments to customers located outside the State of California and 37 percent to customers located inside the state. In both instances, the declarations showed that none of the property was "in a manufacturing process or production."

Both Zee and Formosa filed claims for exemption which were denied. Thereafter they paid the taxes under protest and exhausted their administrative remedies before bringing suit. A declaration filed in behalf of defendants stated, without contradiction, that "there is a flow of traffic of substantial proportions by which goods arrive in California from other states for distribution throughout the United States or throughout various regions of the United States."

There was a stipulation of facts in the Sears case. This stipulation showed that the goods which were the subject matter of the litigation were manufactured or produced outside the United States and imported by Sears and placed in distribution warehouses "where they are held awaiting distribution to destinations both within and outside of the state . . . for the purpose of sale in the ordinary course of Sears' trade or business" which was "selling goods at retail." "The distribution warehouses located in the County of Los Angeles were devoted almost entirely to the distribution of goods which were imported from foreign countries, particularly from locations in the Pacific area." Sears had other warehouses not in the County of Los Angeles for the purpose of longterm storage. The rate of turnover at the distribution warehouses averaged approximately three times per year. The goods were "meant to be shipped as quickly as distribution operations permit." Though no percentage was stated in the stipulation, the respective volumes of California and out-of-state shipments from the warehouses during the year preceding March 1, 1976, and the inventory on that date, were stated in an exhibit which resulted in a claim of exemption for property having a value of $19,373,089 by application of the percentage method specified in Revenue and Taxation Code section 225.1, subdivision (1).

The stipulation further stated that "Sears paid said tax under protest, claiming an exemption pursuant to Revenue and Taxation Code Sections 225 and 225.1, and thereafter duly exhausted its administrative remedies. No refund of any portion of said taxes was made to Sears, and this action was duly commenced."

Cross-motions for summary judgment were made by defendants in both cases. The motions of plaintiffs in each case were granted, and the cross-motions were denied. Judgments were entered for plaintiffs for refunds for the amount of their claims.

## Contentions

The contentions of the respective parties are substantially similar in both cases. Defendants contend that (1) the exemption provided by Revenue and Taxation Code section 225 does not apply to the inventory of plaintiffs because, properly construed, such section provides only for the exemption of goods "in transit" through the state; (2) if section 225 is construed to exempt imported goods being held here at the pleasure of the owner for disposal or use, it violates the United States Constitution by regulating interstate and foreign commerce and interfering with foreign affairs, since it extends no such exemption to interstate goods; (3) defendants have standing to raise this constitutional objection; and (4) the proper remedy is to invalidate the exemption, not extend it to interstate goods similarly held in this state.

Plaintiffs contend that (1) the clear language and purpose of Revenue and Taxation Code section 225 makes its exemption applicable to their imported goods, and forecloses the restrictive interpretation advanced by defendants; (2) defendants have no standing to raise their constitutional objection; (3) section 225 does not violate the United States Constitution; and (4) even if the selective exemption is invalid, the court has the power to correct the defect by extending the exemption to interstate goods.

## Discussion

### Summary

The language of Revenue and Taxation Code sections 225 and 225.1 is unequivocal. It does not simply codify the existing constitutional exemption of goods "in transit." Since it contains no ambiguity in this respect, it cannot be so interpreted to avoid constitutional objections. The selective exemption of goods of foreign origin, thereby giving them a competitive advantage over interstate goods, is a regulation of interstate and foreign commerce in violation of the commerce clause in the United States Constitution. It is, therefore, invalid. Defendants have standing to raise this constitutional objection. The proper remedy is to invalidate the exemption, not extend it to interstate goods.

 *Revenue and Taxation Code*
*Sections 225 and 225.1 Clearly*
*Exempt the Property in Issue*

Section 225 exempts "property manufactured or produced . . . (2) outside of the United States and brought into this state *for transshipment out of this state,* for sale in the ordinary course of trade or business . . . ." (Italics added.) The exemption does not apply to "personal property in manufacturing process or production" but "[s]uch process or production shall not include the breaking in bulk, labeling, packaging, relabeling, or repackaging of such property."

Section 225 does not define "transshipment." Defendants point to dictionary definitions of "transshipment": for example, "to transfer from one ship, train, etc. to another" (Webster's New World Dict. (1968)) as supporting their contention "that this statute is declarative of existing commerce clause law," which exempts interstate and foreign goods "in transit."

Though defendants never specifically state what facts would be required to be shown to establish the exemption under this interpretation, inferentially the taxpayer would be required to prove that the goods had a specific further destination when they arrived in this state, that any interruption in their passage was "due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement," and that they were not being "held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the State, or for shipment elsewhere, as his interest dictates . . . ." (*Minnesota* v. *Blasius* (1933) 290 U.S. 1, 9-10 [78 L.Ed. 131, 135-136, 54 S.Ct. 34].)

The "in transit" doctrine, which is applicable equally to foreign and interstate goods (cf. *Blasius,* which involved interstate goods, with *Carson Petroleum Co.* v. *Vial* (1929) 279 U.S. 95 [73 L.Ed. 626, 49 S.Ct. 292] and *Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276, 302 [46 L.Ed.2d 495, 512-513, 96 S.Ct. 535]) was well defined years before the adoption of section 225. The Legislature was no doubt familiar with the term "in transit"[2] used to refer to it. The term "transshipment" which the Legislature used, on the other hand, has not been used to describe goods protected by the "in transit" doctrine. The Legislature's use of the word

---

[2] See Revenue and Taxation Code section 32051, enacted in 1955.

"transshipment" does not, therefore, justify defendants' interpretation of the section.

Moreover, the meaning of transshipment as used in section 225 is clearly defined in section 225.1. Section 225.1 establishes two methods for claiming the exemption. The first is "a percentage method *of determining property held for transshipment* . . . at a particular location . . . ." (Italics added.) By establishing a method of determining what property is held for transshipment, this section necessarily defines "transshipment" as used in Revenue and Taxation Code section 225. The method specified is "by allocating a portion of the total inventory, using the percentage determined by dividing the total out-of-state shipments by the taxpayer from that location during the preceding year by the total of such shipments from that location during such year . . . ." The standard thereby established is totally inconsistent with the requirements of "in transit" status. It is even unnecessary that any of the goods on hand on tax day actually be shipped out of the state, and the determination method totally disregards the purpose of the interruption of the journey.

The alternative method specified in section 225.1 is equally inconsistent with the requirements of the "in transit" exemption. It only permits the exemption for goods possessed on tax day which actually are shipped out of state pursuant to contracts then in effect requiring such further shipment, but it totally ignores both the requirement that the interruption of the journey be "for the purpose of safety and convenience in the course of the movement," and the prohibition of the property "being held there at the pleasure of the owner, for disposal or use . . . ." (*Minnesota* v. *Blasius, supra,* 290 U.S. at p. 10 [78 L.Ed. at p. 136].)

The standards for the determination of transshipment status stated in Revenue and Taxation Code section 225.1 are, therefore, inconsistent with and contrary to the standard for determination of the existence of "in transit" status.

In view of the standards thus unequivocally established in section 225.1 for "determining property held for transshipment," there is no room for interpretation of the scope of the exemption provided. "The intent of the Legislature must be ascertained from the language of the enactment and where, as here, the language is clear, there can be no room for interpretation." (*Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 353-354 [139 P.2d 930].) Consequently, defendants' arguments that the statute must be construed to apply only to goods "in transit" (1) in order to avoid serious constitutional objections, and (2) to carry out the

Legislature's view stated in the act adopting these sections that "the net loss of revenues to any local agency is not significant"[3] are untenable.

Though as will appear, *infra,* we agree with defendants that sections 225 and 225.1 create an invalid exemption, we cannot avoid the necessity of so holding by placing an unacceptable interpretation upon the legislative language.

The Legislature's expressed understanding that the net loss of revenues to local agencies would not be significant falls into the same category; it cannot require a disregard of the clear language of the section.[4]

We, therefore, conclude that the property of the plaintiffs was exempt under the provisions of Revenue and Taxation Code section 225.

 *The exemption Violates the*
*Federal Constitution Regulating*
*Interstate and Foreign Commerce*

In the absence of sections 225 and 225.1, inventory brought from outside the State of California and held in the manner employed by plaintiffs would be subject to ad valorem taxation regardless of whether its source was a foreign nation, or another state in the United States. Unless it qualifies as goods "in transit," inventory of interstate or foreign goods "held there at the pleasure of the owner, for disposal or use" is subject to nondiscriminatory ad valorem taxation. Until 1975, this rule was subject to a limitation with respect to foreign imports that they could not be so taxed while they remained in the original package. Such limitation, however, was removed by the decision of the United States Supreme Court in *Michelin Tire Corp.* v. *Wages, supra,* 423 U.S. 276, overruling prior decisions so construing article I, section 10, clause 2, of the United States Constitution prohibiting state imposts or duties on imports or exports.

As a result of *Michelin,* goods manufactured in a foreign country and imported to this state are subject to ad valorem taxes under like conditions as the same goods manufactured in another state and brought here. Both categories are constitutionally subject to ad valorem taxation

---

[3]Statutes of 1975, chapter 1126, section 4, page 2746.

[4]Moreover, in light of the constitutional doctrine exempting imports in the original package which was in effect at the time of enactment, it is not clear that the loss of revenue resulting from the exemption was necessarily significant. Most of the imports being held for transshipment probably were in their original packages.

by this state unless they remain "in transit." The effect of Revenue and Taxation Code sections 225 and 225.1, however, as we have held, is to exempt goods whose place of origin is a foreign country if it is established, pursuant to section 225.1, that they are held for further transport outside this state. No such exemption, however, is extended to goods whose place of origin is other states and which can similarly be shown to have been brought to this state for transshipment out of this state. For example, the same goods manufactured in Hawaii or Alaska and transported to California for distribution in the fashion employed by plaintiffs, would be subject to ad valorem taxation.

Different tax treatment is, therefore, accorded to such goods solely on the basis of their place of origin. Foreign goods are thereby given a competitive advantage over interstate goods of the same nature and competing in the same market.

Article I, section 8, clause 3 of the United States Constitution provides that Congress shall have power "[t]o regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes." ■ As stated in the concurring opinion of Justice Aiso in *Bethlehem Steel Corp.* v. *Board of Commissioners* (1969) 276 Cal.App.2d 221, 230-231 [80 Cal.Rptr. 800]:

"The power to regulate commerce with foreign nations is an express grant by the people to the federal government. (*Gibbons* v. *Ogden* (1824) 22 U.S. (9 Wheat.) 1, 187-189 [6 L.Ed. 23, 68].) 'It is an essential attribute of the power that it is exclusive and plenary. As an exclusive power, its exercise may not be limited, qualified or impeded to any extent by state action. [Citations.] The power is buttressed by the express provision of the Constitution denying to the States authority to lay imposts or duties on imports or exports without the consent of the Congress. Art. 1, § 10, ¶ 2. [¶] The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted.' (*University of Illinois* v. *United States* (1932) 289 U.S. 48, 56-57 [77 L.Ed. 1025, 1028; 53 S.Ct. 509, 510].)

" '[T]o regulate commerce is to prescribe . . . the conditions upon which it shall be conducted; to determine how far it shall be free and untrammeled, how far it shall be burdened by duties and imposts, and how far it shall be prohibited.' *Welton* v. *Missouri* (1875) 91 U.S. 275, 279-280 [23 L.Ed. 347, 349].)"

In *Boston Stock Exchange* v. *State Tax Comm'n* (1977) 429 U.S. 318, 328 [50 L.Ed.2d 514, 523, 97 S.Ct. 599], the high court said: "As in *Great A&P Tea Co.* v. *Cottrell*, 424 U.S. 366 (1976), we begin with the principle that '[t]he very purpose of the Commerce Clause was to create an area of free trade among the several States.' *McLeod* v. *J. E. Dilworth Co.*, 322 U.S. 327, 330 (1944). It is now established beyond dispute that 'the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. . . . [*T*]*he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States.*' *Freeman* v. *Hewit*, 329 U.S. 249, 252 (1946)." (Italics added.)

■ The state imposition of discriminatory tax burdens upon interstate or foreign commerce necessarily limits, qualifies and impedes Congress' power to prescribe the conditions under which interstate and foreign commerce are to be conducted. The principal mode through which Congress has exercised its power to regulate competition between interstate and foreign commerce is by the imposition of import tariffs, designed for the most part to afford protection to United States manufactured goods threatened by foreign competition. As stated by the majority opinion in *Bethlehem Steel, supra,* 276 Cal.App.2d at page 226: "Only the federal government can fix the rules of fair competition when such competition is on an international basis. Foreign trade is properly a subject of national concern, not state regulation. State regulation can only impede, not foster, national trade policies."

For this reason, state taxes which discriminate between classes of interstate and foreign goods on the basis of their origin are not permitted. This is clear from the statement of the United States Supreme Court in *Michelin Tire Corp.* v. *Wages, supra,* 423 U.S. 276. In explaining why a nondiscriminatory tax was not prohibited, the court said (*id.,* at p. 286 [46 L.Ed.2d at pp. 503-504]): "It is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the Clause's prohibition. By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to *encourage* or *discourage* any importation in a manner inconsistent with federal regulation." (Italics added.)

More recently, the United States Supreme Court in *Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274 [51 L.Ed.2d 326, 97 S.Ct. 1076], referred to a discriminatory tax as a "tailored tax," noting that "property taxes also may be tailored to differentiate between property used in transportation and other types of property . . . . A tailored tax, however accomplished, must receive the careful scrutiny of the courts to determine whether it produces a forbidden effect on interstate commerce." (*Id.*, at pp. 288-289, fn. 15 [51 L.Ed.2d at p. 337].)

Contrary to plaintiffs' claim that the only discrimination interdicted by the commerce clause is discrimination in favor of local commerce and against interstate or foreign commerce, the decision in *Boston Stock Exchange* v. *State Tax Comm'n, supra,* 429 U.S. 318, holds that discriminatory tax burdens which favor one class of commerce, subject to the control of Congress, over another such class, are equally prohibited. In that case, a state tax which discriminated between two types of interstate transactions was struck down. The court said (*id.*, at p. 335 [50 L.Ed.2d at pp. 527-528]): "There has been no prior occasion expressly to address the question whether a State may tax in a manner that discriminates between two types of interstate transactions in order to favor local commercial interests over out-of-state businesses, but the clear import of our Commerce Clause cases is that such discrimination is constitutionally impermissible."

Discrimination between (1) interstate transactions and foreign transactions cannot be distinguished from (2) discrimination between two types of interstate transactions. Both interstate and foreign transactions are brought within the control of Congress by the same clause of the United States Constitution.

In any event, there is no merit to the argument that only the imposition of discriminatory burdens upon foreign commerce interferes with Congress' power to regulate in that field. As pointed out in *Michelin, supra,* 423 U.S. at page 286 [46 L.Ed.2d at page 504], discriminatory taxes, if "applied selectively to *encourage* or discourage . . . importation in a manner inconsistent with federal regulation," are invalid. (Italics added.) The capacity of such selective taxation to interfere with Congress' power is easily illustrated: Congress concludes that American producers require protection from the competition of Japanese transistor radios and imposes a tariff deemed sufficient to accomplish such protection. A California tax exemption favoring the foreign product offsets the tariff in

respect of goods imported through this state with the result that the competitive advantage intended by Congress is diminished *pro tanto.*

The imposition of discriminatory burdens is not saved by the fact that they are imposed after the interstate or foreign goods have become incorporated into the mass of property of the state. In *Boston Stock Exchange* v. *State Tax Comm'n, supra,* 429 U.S. at pages 332-333, footnote 12 [50 L.Ed.2d at page 526]. the court said: "Because of the discrimination inherent in § 270-a, we also reject the Commission's argument that the tax should be sustained because it is *imposed on a local event at the end of interstate commerce.* While it is true that, absent an undue burden on interstate commerce, the Commerce Clause does not prohibit the States from taxing the transfer of property within the State, the tax may not discriminate between transactions on the basis of some interstate element. *International Harvester Co.* v. *Department of Treasury,* 322 U.S. 340, 347-348 (1944). As was held in *Welton* v. *Missouri,* 91 U.S. 275, 282 (1876): '[T]he commercial power [of the Federal Government] continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character. That power protects it, even after it has entered the State, from any burdens imposed by reason of its foreign origin.' " (Italics added.)

The fact that there may be rational grounds for the state to exempt imported goods destined for transshipment to another state which do not apply to interstate goods in the same category cannot validate the exemption. It may be that there is a greater threat of business flight from California by importers accustomed to the benefits of the original package doctrine than by distributors of interstate goods. But such considerations do not justify a state's utilization of a tax differential as a means of regulating interstate and foreign commerce. Only Congress is authorized to .so act. Referring to comparable state policies urged in support of the California Buy American Act, the majority opinion said in *Bethlehem Steel Corp.* v. *Board of Commissions, supra,* 276 Cal.App.2d at pages 225-226: "That there are countervailing state policies which are served by the retention of such an act is 'wholly irrelevant to judicial inquiry' (*United States* v. *Pink,* 315 U.S. 203, 233 [86 L.Ed. 796, 819, 62 S.Ct. 552]) since '[i]t is inconceivable that any of them can be interposed as an obstacle to the effective operation of a federal constitutional power.' (*United States* v. *Belmont, supra,* 301 U.S. 324, 332 [81 L.Ed. 1134, 1140].)"

If the defendants were invoking the equal protection clause of the United States Constitution, the existence of a rational basis for the discrimination would be an answer to their claims. (Cf. *Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 529 [3 L.Ed.2d 480, 486, 79 S.Ct. 437].) But no authority has been cited suggesting that policy considerations grounded in the state's desire to avoid business flight to another state can be the basis for usurping Congress' commerce power. Exactly such considerations were found not to be sufficient to validate such state action in *Boston Stock Exchange* v. *State Tax Comm'n, supra.*

We conclude, therefore, that by granting an exemption to foreign goods which is withheld from interstate goods, Revenue and Taxation Code section 225 violates the commerce clause of the United States Constitution.

██ *Defendants Have Standing to Raise the Unconstitutionality of the Exemption*

Plaintiffs challenge the standing of defendants, as mere political subdivisions of the state, to invoke any federal constitutional objection to the enactments of the California Legislature. They rely upon the decision of this court in *Community Television of So. Cal.* v. *County of Los Angeles* (1975) 44 Cal.App.3d 990 [119 Cal.Rptr. 276], and upon *Appeal of Martin* (1974) 286 N.C. 66 [209 S.E.2d 766]. In *Community Television,* the County of Los Angeles claimed that a tax exemption was "unconstitutional as a violation of the equal protection clauses of the federal and state Constitutions" (44 Cal.App.3d at p. 998) by discriminating in favor of some charitable organizations and against others without logical basis. The court refused to consider this constitutional objection (though it did discuss another purely state constitutional objection—the prohibition against gifts of public funds), saying (*ibid.*): "We need not dwell long on this argument since the appellants are in no position to raise the issue. As a political subdivision of the state and not being parties who belong to a class allegedly discriminated against they lack the standing to make such a challenge. (*City of New York* v. *Richardson,* 473 F.2d 923; *Data Processing Service* v. *Camp,* 397 U.S. 150 [25 L.Ed.2d 184, 90 S.Ct. 827]; *Flast* v. *Cohen,* 392 U.S. 83 [20 L.Ed.2d 947, 88 S.Ct. 1942]; *Harman* v. *City and County of San Francisco,* 7 Cal.3d 150 [101 Cal.Rptr. 880, 496 P.2d 1248].)"

*Appeal of Martin* involved a challenge to tax legislation on the basis of a state constitutional requirement of "uniformity." The taxing county was

denied standing on dual grounds: first, that it was voluntarily proceeding under the statute claiming benefits thereunder and would not be heard " 'to question its constitutionality in order to avoid its burdens.' " (209 S.E.2d at p. 772.) The other ground for holding lack of standing was: "Finally, the County is precluded from challenging the constitutionality of G.S. § 105-281 (1969 Cum.Supp.) on yet another ground: It is not a member of the class subject to the alleged discrimination. State v. Trantham, 230 N.C. 641, 55 S.E.2d 198 (1949); State v. Sims, 213 N.C. 590, 197 S.E. 176 (1938)." (*Id.,* at pp. 772-773.)

Neither case is controlling. As above noted, the objection urged in this case by the defendants is not based upon equal protection. The requirement that the parties "belong to a class allegedly discriminated against" is, therefore, inapplicable. The only function of the discriminatory nature of the tax is to demonstrate its capacity to interfere with the authority of Congress over commerce. The interest herein sought to be protected is not personal to dealers in nonexempt interstate goods; it relates more to the national interest in observing the boundaries of state and federal power.

A comprehensive discussion of this standing question appears in the opinion of the Second Circuit in *City of New York* v. *Richardson* (2d Cir. 1973) 473 F.2d 923, which dealt with the validity of financing and reimbursement policies established by the Social Security Act and the New York Social Services Law. The court upheld the trial court's dismissal of the city's claims based upon equal protection, on the ground of lack of standing. It held, however, that the plaintiffs, who had sued in their official capacities as Mayor and Commissioner of Social Services of the City of New York, did have standing. The court said in this respect (*id.,* at p. 933): "With respect to standing, those plaintiffs who sued in their official capacities may assert constitutional claims against the state under the rule announced in Board of Education v. Allen, 392 U.S. 236, 241, n. 5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). This is so because of the conflict each of these officials must face between his sworn duty to uphold the Constitution of the United States and his responsibility for administering New York's allegedly unconstitutional Social Services Law."

In *Board of Education* v. *Allen* (1968) 392 U.S. 236 [20 L.Ed.2d 1060, 88 S.Ct. 1923], cited above, the United States Supreme Court noted the standing of officials of a school district to challenge the constitutionality of the law requiring them to loan textbooks free of charge to students attending private schools. After stating that the New York Court of

Appeals had "concluded by a 4-3 vote that appellants did have standing," the court explained the basis of this standing as follows (*id.,* at p. 241, fn. 5 [20 L.Ed.2d at p. 1064]): "Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. *There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation. Baker v. Carr,* 369 U.S. 186, 204 (1962)." (Italics added.)

Though the instant suits are, in form, actions against the city and county and not against any of the county's officers, the substance of the action is a test of the propriety of the board of supervisors' refusal to refund plaintiffs' taxes. Revenue and Taxation Code section 5096 provided in pertinent part at the time the actions were commenced:

"On order of the board of supervisors, any taxes paid before or after delinquency shall be refunded if they were:

". . . . . . . . . . . . . . . . . .

"(b) Erroneously or illegally collected."[5]

Suits for refund of taxes paid under protest, which the supervisors refused to refund, were authorized by Revenue and Taxation Code sections 5103 and 5138. The pertinent portion of section 5103 read as follows: "If the board of supervisors or city council rejects a claim for refund in whole or in part, the person who paid the taxes, his guardian, executor, or administrator may within six months after such rejection commence an action in the superior court against the county or a city to recover the taxes which the board of supervisors or the city council have refused to refund."

The present provision, which supersedes both prior sections, is Revenue and Taxation Code section 5140; it reads: "The person who paid the tax, his guardian, the executor of his will, or the administrator of his estate may bring an action in the superior court against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund on a claim filed pursuant to

---

[5]This included taxes collected by county officers for defendant cities. (Rev. & Tax. Code, § 5099.)

Article 1 (commencing with Section 5096) of this chapter. No other person may bring such an action; but if another should do so, judgment shall not be rendered for the plaintiff."

It is thus apparent that the statutorily required form of action to test the propriety of the supervisors' refusal to order a refund of taxes erroneously or illegally collected is a suit against the county. ■ It is "the general rule that the existence of an action at law to recover a refund precludes resort to an extraordinary writ to attack the alleged illegal or erroneous levy of a tax." (*Kahn* v. *East Bay Mun. Util. Dist.* (1974) 41 Cal.App.3d 397, 407 [116 Cal.Rptr. 333].)

The board of supervisors, like all other public officers, were required to take an oath of office which included the undertaking to "support and defend the Constitution of the United States" as well as to "faithfully discharge the duties" of their office. (Cal. Const., art. XX, § 3; Gov. Code, § 1360.) ■ The conflict between the duties of the supervisors under the Constitution of the United States and those which were imposed by Revenue and Taxation Code section 225 justifies the assertion of the constitutional claims by the county, where the propriety of the supervisors' refusal to order a refund depends upon the constitutionality of the exemption. The control of the litigation is in the hands of the supervisors, the propriety of their conduct is the issue; thus, they are real if not technical parties to the action.

The general standard for determining standing also is met. As our Supreme Court said in *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 159 [101 Cal.Rptr. 880, 496 P.2d 1248]: " 'The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a . . . court, and not in the issues he wishes to have adjudicated.' (*Flast* v. *Cohen, supra* [392 U.S.], at p. 99 [20 L.Ed.2d at p. 961, 88 S.Ct. 1942].) A party enjoys standing to bring his complaint into court if his stake in the resolution of that complaint assumes the proportions necessary to ensure that he will vigorously present his case. (*Baker* v. *Carr* (1962) 369 U.S. 186, 204 [7 L.Ed.2d 663, 678, 82 S.Ct. 691].) As Professor Jaffe has stated, we must determine standing by a measure of the 'intensity of the plaintiff's claim to justice.' (Jaffe, *supra,* 75 Harv.L.Rev. at p. 304.)"

The defendants, as local agencies largely dependent upon ad valorem taxation to provide funds for necessary local services, have reason to "vigorously present" the constitutional questions, and have done so. The

supervisors, who control the county's conduct of the litigation, have a significant "personal stake in the outcome" of the litigation which will resolve the conflict between their duties under the United States Constitution and the duties of their office.

Under the circumstances, no valid purpose would be served by prolonging the uncertainty as to the validity of significant tax legislation on the basis of the form of the actions. We, therefore, conclude that the constitutionality of the exemption is properly before this court.

*The Exemption May Not Be Judicially*
*Broadened to Include Interstate Goods*

Plaintiffs suggest that if the exemption provided by Revenue and Taxation Code section 225 is invalid because it is not also made applicable to goods whose origin is interstate commerce, the proper remedy is to judicially broaden the exemption to include the interstate goods. They cite in this respect the opinion of our Supreme Court in *Haman* v. *County of Humboldt* (1973) 8 Cal.3d 922 [106 Cal.Rptr. 617, 506 P.2d 993]. In *Haman,* the plaintiffs sought to recover the property tax they paid on their fishing boats for the calendar year 1968, in excess of the amount they would have been required to pay under Revenue and Taxation Code section 227, subdivision (a), if their port of documentation were in the State of California.

Section 227 provided that:

"A documented vessel, . . . shall be assessed at one percent (1%) of its full cash value only if:

"(a) The port of documentation is in this state.

"(b) The vessel is engaged or employed exclusively:

"(1) In the taking and possession of fish or other living resource of the sea for commercial purposes, or

"(2) In instruction or research studies as an oceanographic research vessel." The port of documentation requirement was held an invalid discrimination against California residents owning fishing boats documented in other states. The court then considered the relief to be granted and stated in this respect:

"In cases involving invalid differentials in tax treatment, the court has the *power* to eliminate the discriminatory treatment either by granting those taxpayers, who have been assessed the higher rate, a refund based on the difference between the lower rate and the one under which they were assessed, i.e., taxing all vessels at 1 percent, or by providing that in the future the board of equalization adjust the assessment rolls so that the higher rate will be applied to all like taxpayers. (*Security-First Nat. Bk.* v. *County of L.A.*, 35 Cal.2d 319, 322 [217 P.2d 946]; *Jones Lbr. Co.* v. *Del Norte County*, 251 Cal.App.2d 645, 650 [59 Cal.Rptr. 644].) In determining the proper remedy, we must adopt the one which will best further the legislative intent without increasing discrimination among other taxpayers.

"The main purpose of the 1 percent assessment is obviously to aid California's ailing fishing industry. The statute requires that as well as having a port of documentation within the state, the vessel must be '. . . engaged or employed exclusively: (1) In the taking and possession of fish or other living resource of the sea *for commercial purposes,* . . .' (Italics added.) . . .

"We conclude that the legislative intent is properly carried out by holding invalid subdivision (a) of section 227, which requires that the port of documentation be within this state, and by upholding the balance of the section. Accordingly, plaintiffs are entitled to a refund. [Fn. omitted.]" (*Haman* v. *County of Humboldt, supra,* 8 Cal.3d at pp. 928-929.) (Italics added.)

Assuming that the process described in *Haman* is equally applicable to exemptions as it is to rate differentials,[6] we conclude that the legislative intent is properly carried out in this case by holding invalid the exemption of goods manufactured outside the United States and brought to California for transshipment, and denying refund.

As the statement in *Haman* indicates, by considering an alternative of "providing that in the future" the higher rate will be applied to all boat owners, the inquiry into legislative intent must be made on a prospective basis. We must, therefore, assess the situation in light of present circumstances.

---

[6]The constitutional authority for exemptions and rate differentials is found in the same article XIII, section 2 of the California Constitution which states: "The Legislature, two-thirds of the membership of each house concurring, may classify such personal property for differential taxation or for exemption."

Plaintiffs argue that the legislative history indicates the principal purpose of Revenue and Taxation Code section 225 was to promote utilization of California ports and discourage removal of import business to states with a more favorable tax structure. This purpose, they say, can best be furthered by enlarging the exemption to include interstate goods, whereas it would be totally frustrated by invalidating the exemption of foreign goods.

There are, however, other factors to consider. The Legislature clearly indicated in the enacting statute that it did not intend thereby to deprive local agencies of significant revenue. Section 4 of the act stated: "No appropriation is made by this act, nor is any obligation created thereby under Section 2229 of the Revenue and Taxation Code, for the reimbursement of any local agency for any revenue lost by it as a result of the exemption of property from taxation by this act because the net loss of revenues to any local agency is not significant." (Stats. 1975, ch. 1126, § 4, p. 2746.)

Unquestionably, the Legislature's estimate of the-revenue loss was made in view of the then existing original package doctrine which effectively exempted foreign goods from local ad valorem taxation. Most of the imports exempted by Revenue and Taxation Code section 225 would be exempt anyway on the basis of said doctrine. However, subsequent to the enactment of section 225, the United States Supreme Court in *Michelin Tire Corp.* v. *Wages, supra,* overruled the original package doctrine and made all imported goods, no longer "in transit," subject to nondiscriminatory local ad valorem taxation. After the decision in *Michelin,* the effect of section 225 is clearly to deprive local agencies of significant revenue, as the judgments in these cases demonstrate. (The judgment in Sears' favor alone exceeded $284,000 with respect to a single year.) We cannot assume that the Legislature would have approved section 225 had it understood that a loss of any such proportions was involved. There is even less basis to assume that the Legislature would be willing to subject local agencies to the additional deprivation of revenue which would inevitably result from expanding the exemption to include goods originating in interstate commerce, which were being taxed. This is especially true in view of the subsequent adoption of Proposition 13, critically reducing the tax base of local agencies to a level which the Legislature apparently considers inadequate for the rendition of required local services, as evidenced by the action taken to provide state funds for such purpose.

Cognizance must also be taken in this respect to the fact that since 1939 the Legislature has indicated that an exemption from taxation is not intended unless express provision be made therefor. Revenue and Taxation Code section 201 has provided: "All property in this State, not exempt under the laws of the United States or of this State, is subject to taxation under this code." Consequently, when section 225 was enacted limiting the exemption to goods manufactured outside the United States, it expressly denied the exemption to goods manufactured in other states.

We may also assume that in acting in respect to this matter, the Legislature would be guided by the purpose of the California constitutional provisions governing tax exemptions. As our Supreme Court stated in *Watchtower B. & T. Soc.* v. *County of L. A.* (1947) 30 Cal.2d 426, 429 [182 P.2d 178], referring to California Constitution, article XIII, section 1: "The purpose of that provision is to secure equality of taxation which results from subjecting all property to the same burden."

In the same vein, the court in *County of Amador* v. *State Board of Equalization* (1966) 240 Cal.App.2d 205, 224 [49 Cal.Rptr. 448], said: "Without regard to the identity of the assessing agency, article XIII, section 1, of the Constitution requires that all property be taxed in proportion to its value. The constitutional goals are equality and uniformity."

Since we find no reasonable basis for the assumption that the Legislature would, in light of present circumstances, prefer extending the exemption, any attempt on our part to broaden the exemption would violate the requirement of article XIII, section 2, of the California Constitution that the creation of exemptions be approved by a vote of two-thirds of the Legislature. We consequently hold that the discriminatory exemption created by the statute is invalid, and that plaintiffs' goods are properly subject to taxation.

The judgments are reversed and both causes remanded to the trial court which is directed to enter judgments in favor of defendants.

Cobey, J., and Allport, J., concurred.

Respondents' petitions for a hearing by the Supreme Court were denied January 17, 1979. Mosk, J., Richardson, J., and Manuel, J., were of the opinion that the petitions should be granted.