[L.A. No. 31918. June 30, 1986.]

STAR-KIST FOODS, INC., Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

**4**

**COUNSEL**

Ajalat & Polley, Charles R. Ajalat, Terry L. Polley and Richard J. Ayoob for Plaintiff and Appellant.

Mandel, Kavaller & Manpearl, Gerald T. Manpearl and Kent Ten Brink as Amici Curiae on behalf of Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, Donald K. Byrne, Chief Deputy County Counsel, Philip Hickok and Edward G. Pozorski, Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**REYNOSO, J.**—We consider two questions: whether counties and municipalities may challenge the constitutionality of a statute exempting from ad valorem taxation business inventories of foreign origin or destination which are transshipped through the state; and if so, whether such exemption violates the commerce clause. We conclude that counties and municipalities may raise such a challenge, and that the statute in question offends the commerce clause.

The parties stipulated to the relevant facts. For tax year 1976-1977, defendants, Los Angeles County and the Cities of Los Angeles and Long Beach, assessed and levied ad valorem taxes on plaintiff Star-Kist Foods, Inc.'s[1] inventory of canned tuna present in its California warehouses on March 1, 1976, the lien date.[2] Star-Kist paid the tax, but sought a refund

---

[1] Star-Kist is a California corporation.

[2] In 1978, the Legislature enacted Revenue and Taxation Code section 538 which requires an assessor who questions the constitutionality of a particular tax provision to bring an action for declaratory relief against the State Board of Equalization in lieu of making the disputed assessment. (Stats. 1978, ch. 1188, § 1, eff. Sept. 26, 1978.) As this controversy arose before section 538 was enacted, section 538 does not apply to these proceedings.

of the $44,197 assessed on that portion of Star-Kist's inventory that had been manufactured or produced outside the United States and brought into California for shipment to other states for sale in the ordinary course.[3]

Star-Kist based its refund claim on the exemption contained in newly enacted Revenue and Taxation Code[4] section 225, which provided an exemption from taxation for "[p]ersonal property manufactured or produced, (1) outside this state and brought into this state for transshipment out of the United States, or (2) outside of the United States and brought into this state for transshipment out of this state, for sale in the ordinary course of trade or business. . . ."[5]

After exhausting its administrative remedies, Star-Kist brought suit in Los Angeles County Superior Court for refund of the contested taxes. Defendants asserted that the statutory exemption was invalid in that it violated the commerce clause of the federal Constitution (U.S. Const., art. I, § 8, cl. 3) by interfering with Congress' plenary power over commerce, in that it discriminated against interstate commerce.

Relying on *Zee Toys, Inc.* v. *County of Los Angeles* (1978) 85 Cal.App.3d 763 [149 Cal.Rptr. 750], hearing denied, January 17, 1979, affirmed without opinion by an equally divided court in *Sears, Roebuck and Co.* v. *County of Los Angeles* (1981) 449 U.S. 1119 [67 L.Ed.2d 106, 101 S.Ct. 933], in which the Court of Appeal held that section 225 violated the commerce clause and was void, the trial court denied plaintiff's refund claim. This appeal followed.

I

Before reaching the merits of defendants' charge that section 225 violates the commerce clause, we must determine whether defendants have "standing" to raise such a challenge to a state law. The term "standing" in this context refers not to traditional notions of a plaintiff's entitlement to seek judicial resolution of a dispute,[6] but to a narrower, more specific

[3]The inventory in question was valued at $655,140. The assessed value of Star-Kist's total inventory for 1976-1977 was $5,699,300 upon which Star-Kist paid ad valorem taxes in the amount of $394,316.

[4]All statutory references are to the Revenue and Taxation Code unless otherwise indicated.

[5]Section 225 was repealed in 1984. Section 219 now exempts all business inventory from taxation. (Added by Stats. 1980, ch. 411, § 8, p. 801, urgency, eff. July 11, 1980, operative Jan. 1, 1981.)

[6]One could argue that, in practical effect, defendants' willful campaign to supplant section 225's exemption by ignoring it and forcing plaintiff to bring a refund suit makes defendants the "true" plaintiffs in this controversy. Regardless of party designation, however, the threshold question as to whether the county and cities may challenge the statute remains the same.

inquiry focused upon the internal political organization of the state: whether counties and municipalities may invoke the federal Constitution to challenge a state law which they are otherwise duty-bound to enforce.

Counties and cities must look to the state Constitution and the Legislature for their creation and delegated powers. (Cal. Const., art. XI, §§ 1, 2.) ■ Counties are "merely . . . political subdivision[s] of state government, exercising only the powers of the state, granted by the state, created for the purpose of advancing 'the policy of the state at large . . . .'" (*County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 638-639 [2 Cal.Rptr. 758, 349 P.2d 526].) ■ Though municipalities may enjoy a greater degree of autonomy with regard to local affairs (*Wilson* v. *Beville* (1957) 47 Cal.2d 852, 858-859 [306 P.2d 789] [charter cities]), they too are subject to the sovereign's right to extend, withdraw or modify the powers delegated. (*Trenton* v. *New Jersey* (1923) 262 U.S. 182, 187 [67 L.Ed. 937, 941, 43 S.Ct. 534, 29 A.L.R. 1471]. See *People* v. *California Fish Co.* (1913) 166 Cal. 576, 606 [138 P. 79].)[7]

■ This legislative control over cities and counties is reflected in the well-established rule that subordinate political entities, as "creatures" of the state, may not challenge state action as violating the entities' rights under the due process or equal protection clauses of the Fourteenth Amendment or under the contract clause of the federal Constitution. "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator. [Citations.]" (*Williams* v. *Mayor of Baltimore* (1933) 289 U.S. 36, 40 [77 L.Ed. 1015, 1020, 53 S.Ct. 431]. Accord *Newark* v. *New Jersey* (1923) 262 U.S. 192, 196 [67 L.Ed. 943, 946, 43 S.Ct. 539] [equal protection clause]; *Trenton, supra,* 262 U.S. at pp. 185-187 [67 L.Ed. at pp. 940-941] [contract clause and Fourteenth Amendment]; *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 209 [282 P.2d 481] [contract clause]; *City of Los Angeles* v. *City of Artesia* (1977) 73 Cal.App.3d 450, 457 [140 Cal.Rptr. 684] [contract clause and due process clause].) This rule's application beyond Fourteenth Amendment and contract clause challenges remains unsettled.

---

[7]The California Constitution provides that, with limited exception, "[a]ll property is taxable . . ." (Cal. Const., art. XIII, § 1, subd. (a).) The Constitution further empowers the Legislature to "provide for property taxation of all forms of tangible personal property," and to "classify such personal property for differential taxation or for exemption." (Cal. Const., art. XIII, § 2.) The Legislature, in turn, has delegated responsibility for assessment, levy and collection of property taxes to local government. (Gov. Code, §§ 23004, subd. (e), 43000 et seq., 51501.) This delegated authority, however, does not include the power to originate a tax; only those taxes expressly authorized by statute may be assessed. (*County of Los Angeles* v. *Jones* (1939) 13 Cal.2d 554, 561-562 [90 P.2d 802].)

In *City of South Lake Tahoe* v. *California Tahoe* (9th Cir. 1980) 625 F.2d 231, certiorari denied, 449 U.S. 1039 [66 L.Ed.2d 502, 101 S.Ct. 619] (White, Marshall, JJ., dis.) the Ninth Circuit interpreted this "no standing" rule as absolutely barring political subdivisions from challenging state statutes on any federal constitutional ground. Regrettably, the *South Lake Tahoe* decision provides little guidance as to the court's reasoning in choosing a per se rule.

The plaintiffs in *South Lake Tahoe,* the city and individual city council members, brought an action for declaratory and injunctive relief, attacking the validity of certain land use regulations and transportation plans adopted by a regional planning agency on four separate constitutional grounds: the plans and regulations violated the Fifth and Fourteenth Amendments in arbitrarily discriminating between similarly situated landowners, violated the right to travel, resulted in the taking of property without just compensation and conflicted with regulations of a congressionally approved bi-state planning agency in violation of the supremacy clause. The court rejected the city's claim of standing to raise the constitutional claims based on the regulation's injurious effects on its municipal finances. After noting that "'[p]olitical subdivisions may not challenge the validity of a state statute under the Fourteenth Amendment,'" and pointing out that it makes no difference whether the challenge is to the state or to a political subdivision thereof, the court simply concluded, "[t]hus, the city may not challenge [the] plans and ordinances on constitutional grounds." (*South Lake Tahoe, supra,* 625 F.2d at p. 233.) The court also denied the individual council members standing for lack of a personal stake in the matter, remarking in passing: "[t]he councilmembers do not seek here to represent the City's interests; if they did their claims would be barred along with the City's." (*Id.,* at p. 237.)

Other courts have declined to read the "no standing" rule as an absolute bar to federal constitutional challenges by political subdivisions. These courts have held that the rule does not extend to supremacy clause challenges to state laws. (*Rogers* v. *Brockette* (5th Cir. 1979) 588 F.2d 1057, cert. den., 444 U.S. 827 [62 L.Ed.2d 35, 100 S.Ct. 52]; *San Diego Unified Port Dist.* v. *Gianturco* (S.D.Cal. 1978) 457 F.Supp. 283, affd. 651 F.2d 1306, cert. den., 455 U.S. 1000 [71 L.Ed.2d 866, 102 S.Ct. 1631]; *Triplett* v. *Tiemann* (D.Neb. 1969) 302 F.Supp. 1239; *Carlsbad Union School District of San Diego County* v. *Rafferty* (S.D.Cal. 1969) 300 F.Supp. 434 affd. (9th Cir. 1970) 429 F.2d 337; *Douglas Independent School District No. 3* v. *Jorgenson* (D.S.D. 1968) 293 F.Supp. 849; *Hergenreter* v. *Hayden* (D.Kan. 1968) 295 F.Supp. 251.) *Rogers* and *Gianturco* provide meaningful insight into the purpose of the "no standing" rule and its one established exception.

The *Rogers* court recognized a school district's standing to raise a supremacy clause challenge to a state law requiring a district with a substantial number of low income students to participate in a federally subsidized school breakfast program. The court also upheld the statute against the school district's challenge.

In resolving the standing question, the *Rogers* court studied the historic basis of the "no standing" rule and concluded that the rule has generally been applied in two types of cases: those in which the state has altered political subdivisions' boundaries (e.g., *Hunter* v. *Pittsburgh* (1907) 207 U.S. 161 [52 L.Ed. 151, 28 S.Ct. 40]), and those involving state modification of a benefit previously granted to a subdivision (e.g., *Trenton, supra,* 262 U.S. 182). (*Rogers, supra,* 588 F.2d at p. 1067.) The court then went on to suggest that ". . . these cases are substantive interpretations of the constitutional provisions involved" (*id.,* at p. 1068), and, as such, simply "adhere to the substantive principle that the Constitution does not interfere with a state's internal political organization." (*Id.,* at p. 1070.) Because there is no comparable limit on Congress' power to "interfere" in a state's internal political organization, the court concluded, a subdivision of the state may raise a claim that state law conflicts with federal law and is therefore void. (*Id.,* at pp. 1070-1071.)

The *Gianturco* court took a related, but somewhat different approach in reaching the conclusion that a political subdivision may invoke the supremacy clause despite its lack of capacity to raise other constitutional claims. In *Gianturco,* a port district operating an airport challenged a flight curfew imposed by the California Department of Transportation as violative of the supremacy clause in that the field was preempted by federal law.

Discussing the standing issue, the *Gianturco* court noted that a distinction between the supremacy clause and other constitutional provisions lies in the purpose served by each. Provisions like the Fourteenth Amendment and the contract clause "confer fundamental rights on individual citizens"; the supremacy clause, in contrast, "establishes a structure of government which defines the relative powers of states and the federal government." (*Id.,* 457 F.Supp. at p. 290.) Political subdivisions cannot assert "constitutional rights which are intended to limit governmental action vis-a-vis individual citizens" but may invoke the supremacy clause to challenge preempted state law. (*Ibid.*) Otherwise "such legislation and regulation often would go unchecked even though expressly prohibited by the Constitution." (*Ibid.*)

 Accepting the *Rogers-Gianturco* rationale for exempting supremacy clause claims from the rule that political subdivisions cannot challenge state law on the basis of the federal Constitution, the question remains whether

this type of commerce clause claim also falls outside the confines of the rule. Based on the similarity between the commerce clause and the supremacy clause, we conclude that it does.

The commerce clause empowers Congress "[t]o regulate commerce with foreign nations, and among the several states, and with Indian tribes." (U.S. Const., art. I, § 8, cl. 3.) ■ As the United States Supreme Court has long emphasized, "'[t]he Commerce Clause, even without implementing legislation by Congress is a limitation upon the power of the States.'" (*Boston Stock Exchange* v. *State Tax Comm'n* (1977) 429 U.S. 318, 328 [50 L.Ed.2d 514, 523, 97 S.Ct. 599], quoting *Freeman* v. *Hewit* (1946) 329 U.S. 249, 252 [91 L.Ed. 265, 271, 67 S.Ct. 274].) In this respect, the commerce clause resembles the supremacy clause in that it, albeit indirectly, "defines the relative powers of states and the federal government." (*Gianturco, supra,* 457 F.Supp. at p. 290.)

■ The defendants' claim in the instant case accents this definitional framework. Defendants assert that the foreign commerce tax exemption interferes with Congress' exclusive control over commerce by potentially nullifying the value of protective tariffs and by discriminating against domestic commerce. The discrimination is merely a side effect of the institutional intrusion. As noted in *Zee Toys, supra,* 85 Cal.App.3d 763, which involved an identical challenge to section 225, "[t]he only function of the discriminatory nature of the tax is to demonstrate its capacity to interfere with the authority of Congress over commerce. The interest herein sought to be protected is not personal to dealers in nonexempt interstate goods; *it relates more to the national interest in observing the boundaries of state and federal power.*" (*Id.,* at p. 778.) (Italics added.)

Viewing the commerce clause challenge in this light leads to the conclusion that political subdivisions might legitimately raise such claims. State action cannot be so insulated from scrutiny that encroachments on the federal government's constitutional powers go unredressed. In the present case, for example, there is a real possibility that the constitutionality of the Legislature's scheme of differential taxation of business inventories would have gone unchecked absent challenge by those entities charged with administration of the program. Moreover, because the foreign commerce exception precluded the local taxing agencies from taxing business inventories they otherwise would have been authorized to tax, the agencies experienced significant revenue loss.[8] Thus, their interest in testing the constitutionality of the statute is unmistakable.

---

[8]When section 225 was enacted, federal law precluded taxation of imports in their original containers. That restriction was abandoned in *Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276 [46 L.Ed.2d 495, 96 S.Ct. 535]. Thus, the Legislature's assumption that under section 225 "the net loss of revenues to any local agency is not significant" (Stats. 1975, ch. 1126, § 4, p. 2746) did not prove to be correct. (See *Zee Toys, supra,* 85 Cal.App.3d at p. 783.)

We therefore conclude that defendants have standing to raise this commerce clause challenge. This result comports with the Legislature's implicit recognition of the right to raise federal constitutional claims in section 538, enacted in 1978. (*Ante,* fn. 2.) Section 538, the Legislature's direct response to Los Angeles County's refusal to implement section 225's exemption (Stats. 1978, ch. 1188, § 4, p. 3840), requires an assessor who believes a tax measure to be unconstitutional or otherwise invalid to seek declaratory relief to that effect, instead of simply imposing an assessment contrary to the questioned law. Because the statutory language speaks to unconstitutionality generally, without differentiating between the federal and state Constitutions, and the legislative history reflects a concern with the commerce clause challenge to section 225, it is reasonably likely that the Legislature did anticipate claims based upon the federal Constitution.

## II

We turn to the question whether section 225, in exempting only certain business inventories from ad valorem taxation, violates the commerce clause.

The commerce clause reserves to Congress exclusive power "[t]o regulate commerce with foreign nations and among the several states . . ." (U.S. Const., art. I, § 8, cl. 3.) The clause does not, however, abrogate the "'power of the states to tax for the support of their own governments.'" (*Boston Stock Exchange, supra,* 429 U.S. at p. 328 [50 L.Ed.2d at pp. 523-524], quoting *Gibbons* v. *Ogden* (1824) 22 U.S. (9 Wheat.) 1, 199 [6 L.Ed. 23, 71].) Determining whether a state tax exceeds the bounds of permissible state action under the clause is often a difficult task. As the United States Supreme Court noted in *Boston Stock Exchange,* ". . . when called upon to make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers, the Court has counseled that the result turns on the unique characteristics of the statute at issue and the particular circumstances in each case." (*Id.,* 429 U.S. at p. 329 [50 L.Ed.2d at p. 524].)

As enacted, section 225 provided: "Personal property manufactured or produced, (1) outside this state and brought into this state for transshipment out of the United States or (2) outside of the United States and brought into this state for transshipment out of this state, for sale in the ordinary course of trade or business shall be exempt from taxation. The exemption under this section shall not apply to personal property in manufacturing process or production. Such process or production shall not include the breaking in bulk, labeling, packaging, relabeling, or repackaging of such

property."[9] As all other business inventories were subject to ad valorem taxation (§ 201; former § 219 repealed by Stats. 1980, ch. 411, § 7), goods manufactured in another state and transshipped through California to a third state were not entitled to the exemption. Thus, those domestic companies exclusively engaged in interstate commerce would be taxed, while those involved in exporting or importing would not be.

At first glance this distinction may not appear particularly troubling.[10] Taxation of foreign commerce has traditionally been off limits to the states. "Although [the commerce clause] grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." (*Japan Line, Ltd.* v. *County of Los Angeles* (1979) 441 U.S. 434, 448 [60 L.Ed.2d 336, 347-348, 99 S.Ct. 1813]. See also *Michelin, supra,* 423 U.S. at p. 286 [46 L.Ed.2d at p. 503].) "Laws which concern the exterior relations of the United States with other nations and governments are general in their nature, and should proceed exclusively from the legislative authority of the nation." (*Bowman* v. *Chicago & N. R. Co.* (1888) 125 U.S. 465, 482 [31 L.Ed. 700, 706, 8 S.Ct.

---

[9]The history of this exemption deserves mention. For over a century, states were prohibited from imposing even nondiscriminatory ad valorem taxes on imported goods while they retained their character as imports. (*Low* v. *Austin* (1872) 80 U.S. (13 Wall.) 29 [20 L.Ed. 517].) In 1972, this court held that imports could be taxed once removed from their original containers. (*Volkswagen Pacific* v. *City of Los Angeles* (1972) 7 Cal.3d 48 [101 Cal.Rptr. 869, 496 P.2d 1237].) The Legislature subsequently enacted section 225, presumably to countermand *Volkswagen Pacific*. Over 35 states have adopted similar "free port" laws, many of which extend tax-exempt status to stored imports. (*Japan Line, Ltd.* v. *County of Los Angeles, The Foreign Commerce Clause: An Economic Approach to the Negative Effects of State Taxation* (1980) 13 J. Mar. L.Rev. 793, 812.)

In 1976, the United States Supreme Court overruled *Low* and lifted the ban on state imposition of taxation on imported goods. In 1978, in *Zee Toys, supra,* 85 Cal.App.3d 763, section 225 was held to be unconstitutional. After this court denied hearing, the United States Supreme Court granted certiorari, ultimately affirming without opinion based on a four-to-four split. (*Sears, Roebuck & Co.* v. *County of Los Angeles* (1981) 449 U.S. 1119 [67 L.Ed.2d 106, 101 S.Ct. 933].)

In the meantime, Los Angeles County was the only county to disregard section 225 and assess taxes on imported goods in tax years 1976-1978. In 1978, on the basis of *Zee Toys,* the State Board of Equalization instructed the remaining counties to levy "escaped assessments" for the years in question. Once again the Legislature stepped in, and passed a protective measure prohibiting such escaped assessments for tax years prior to 1979-1980. (§ 225.3. Added by Stats. 1979, ch. 902, § 2, eff. Sept. 22, 1979; repealed by Stats. 1984, ch. 678, § 12.)

Finally, in 1981, the Legislature enacted section 219, prohibiting taxation of all business inventories. Thus, only a limited number of importers were assessed ad valorem taxes during section 225's limited lifespan.

[10]See e.g., *Westinghouse Electric Corp.* v. *Tully* (1984) 466 U.S. 388, 406, footnote 12 [80 L.Ed.2d 388, 403, 104 S.Ct. 1856] ("We reiterate that it is not the provision of the [franchise tax] credit [for export income] that offends the Commerce Clause, but the fact that it is allowed on an impermissible basis, i.e., the percentage of a specific segment of the corporation's business that is conducted in New York.")

689].) ■ Thus, a state tax scheme may not interfere with Congress's plenary power to regulate commerce with other nations.

The United States Supreme Court's decision in *Japan Lines* reinforces this basic constitutional restriction. In *Japan Lines* the court struck down California's imposition of ad valorem tax on cargo containers owned by a foreign entity, used exclusively in international commerce and fully taxed in the domiciliary country. After emphasizing that "[w]hen construing Congress' power to 'regulate commerce with foreign Nations,' a more extensive constitutional inquiry is required" than that ordinarily employed in determining whether a tax unduly burdens interstate commerce (441 U.S. at p. 446 [60 L.Ed.2d at p. 346]), the court proceeded to identify two additional factors to be considered: the risk of multiple taxation and potential impairment of the nation's ability to "speak with one voice" in foreign affairs. (*Id.*, at pp. 446-449 [60 L.Ed.2d at pp. 346-348].) The court then held that application of the tax to instrumentalities of foreign commerce resulted in multiple taxation and interfered with federal uniformity in regulation of foreign trade, and, thus, violated the commerce clause. (*Id.*, at pp. 451-454 [60 L.Ed.2d at pp. 349-351].) The court acknowledged that this foreign commerce exemption might result in discrimination against domestic commerce, but concluded that Congress would have to resolve such "problems that admit only of a federal remedy." (*Id.*, at p. 457 [60 L.Ed.2d at p. 353].)

*Japan Lines,* however, does not support the proposition that any state tax on foreign commerce is per se invalid. In fact, in *Container Corp.* v. *Franchise Tax Bd.* (1983) 463 U.S. 159 [77 L.Ed.2d 545, 103 S.Ct. 2933] in which the court upheld California's "three-factor" formula for unitary tax assessments against a commerce clause challenge, the court stressed that the *Japan Lines* holding was limited to the narrow issue presented in that case: "'[W]hether instrumentalities of commerce that are owned, based and registered abroad and that are used exclusively in international commerce, may be subjected to apportioned ad valorem property taxation by a State.'" (*Container Corp., supra,* 463 U.S. at pp. 187-188, fn. 24 [77 L.Ed.2d at p. 568].) The court further implied that *Japan Lines* had gone too far in suggesting that the risk of multiple taxation alone would necessarily invalidate a state tax. The tax must be considered in context, including the feasibility of alternative modes of taxation, even if it actually results in multiple taxation. (*Id.*, at pp. 190-194 [77 L.Ed.2d at pp. 569-571].)

In addition, and of particular importance to our discussion, the *Container Corp.* court also refined the second prong of the *Japan Lines* test: whether

the tax interfered with the federal government's ability to "speak with one voice" in foreign affairs. The court instructed: "In conducting this inquiry, . . . we must keep in mind that if a state tax merely has foreign resonances, but does not implicate foreign affairs, we cannot infer, '[a]bsent some explicit directive from Congress, . . . that treatment of foreign income at the federal level mandates identical treatment by the States.' [Citations.] Thus, a state tax at variance with federal policy will violate the 'one voice' standard if it *either* implicates foreign policy issues which must be left to the Federal Government *or* violates a clear federal directive." (*Container Corp., supra,* 463 U.S. at p. 194 [77 L.Ed.2d at pp. 571-572].)

Absent interference with such a directive,[11] nondiscriminatory ad valorem taxation of business inventories does not intrude upon the federal government's foreign commerce power. In *Michelin, supra,* 423 U.S. 276 the court upheld, against an import-export clause challenge, Georgia's assessment of a nondiscriminatory ad valorem tax on imported goods stored as business inventory.[12] The court reasoned that because the purpose of such a property tax is to recover the costs, on an apportioned basis, of locally provided services such as police and fire protection, and the tax is imposed on all property regardless of origin, the tax could not be characterized as an "impost or duty" levied on imported goods. The tax was therefore valid.

In reaching the conclusion that a nondiscriminatory ad valorem tax could be imposed on all goods including imports, the court dismissed the concern that the tax somehow interfered with the federal government's commerce power. The court stressed: "It is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the Clause's prohibition. By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in a manner inconsistent with federal regulation." (*Michelin, supra,* 423 U.S. at p. 286 [46 L.Ed.2d at pp. 503-504].) The court further explained, "[t]he Import-Export Clause clearly prohibits state taxation based on the foreign origin of the imported goods, but it cannot be read to accord imported goods preferential treatment that permits escape from uniform

---

[11]For example, imported goods stored in customs bonded warehouses (19 U.S.C. § 1557(a)) are immune from state taxation. (*Xerox Corp.* v. *County of Harris* (1982) 459 U.S. 145 [74 L.Ed.2d 323, 103 S.Ct. 523].)

[12]Although *Michelin* involved the import-export clause (U.S. Const., art. I, § 10, cl. 2) the court noted in *Japan Lines* that the import-export clause and the commerce clause reflect virtually identical policies with regard to regulation of commerce with foreign nations. (*Id.,* 441 U.S. at pp. 449-450, fn. 14 [60 L.Ed.2d at pp. 348-349].)

taxes imposed without regard to foreign origin for services which the State supplies. [Citation.]" (*Id.*, at p. 287 [46 L.Ed.2d at p. 504].)

*Michelin* teaches that nondiscriminatory ad valorem taxation of business inventories, including inventories linked to foreign commerce, is constitutional and has no impact on the federal government's foreign commerce power. Though we deal, in the instant case, not with imposition of the tax, but with an exemption, the *Michelin* rule is fully applicable. Because the tax itself has no bearing on the foreign commerce power, an exemption from that tax cannot look to the foreign commerce power for its legitimacy. Stated differently, the exemption cannot be necessary to preserve Congress's power to regulate foreign commerce if the tax itself does not interfere with the power to so regulate. The business inventories tax poses no threat to the federal government's ability to "speak with one voice" when regulating commerce with other nations. ▇▇▇ The exemption, then, zwhich leaves in place a tax scheme that appears to discriminate against domestic commerce, cannot be sustained on the traditional ground that the states may not interfere with congressional power "to regulate commerce with foreign nations." (U.S. Const., art. I, § 8, cl. 3.)

Though the exemption cannot be justified as an attempt to protect the foreign commerce power, it can be challenged as interfering with that power. "Only the federal government can fix the rules of fair competition when such competition is on an international basis." (*Bethlehem Steel Corp.* v. *Board of Commissioners* (1969) 276 Cal.App.2d 221, 226 [80 Cal.Rptr. 800].) As the *Zee Toys* court noted, "[t]he principal mode through which Congress has exercised [this] power . . . is by the imposition of import tariffs, designed for the most part to afford protection to United States manufactured goods threatened by foreign competition." (*Id.*, 85 Cal.App.3d at p. 774.) Taxation exemptions extended only to foreign goods may operate to nullify the curative effect of federally imposed tariffs. Conversely, when all goods located within a state are taxed on a nondiscriminatory basis for provided services, federal regulation of competition between interstate and foreign commerce is unimpeded by state policy. The nondiscriminatory tax "cannot be applied selectively to *encourage* or discourage any importation in a manner inconsistent with federal regulation." (*Michelin, supra,* 423 U.S. at p. 286 [46 L.Ed.2d at p. 504].) (Italics added.) Thus, the exemption may actually offend rather than preserve Congress's exclusive power to regulate foreign commerce.

Because Congress's foreign commerce power may not be invoked to curtail serious examination of the tax scheme in question, we must consider whether section 225's exemption results in discrimination against interstate commerce. "A tailored tax, however accomplished, must receive the careful

scrutiny of the courts to determine whether it produces a forbidden effect on interstate commerce." (*Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 289, fn. 15 [51 L.Ed.2d 326, 337, 97 S.Ct. 1076].)

Typically, questions involving discrimination against interstate commerce arise in the context of favored treatment of intrastate commerce over interstate commerce.[13] (E.g., *Maryland* v. *Louisiana* (1981) 451 U.S. 725 [68 L.Ed.2d 576, 101 S.Ct. 2114]; *Lewis* v. *BT Investment Managers, Inc.* (1980) 447 U.S. 27 [64 L.Ed.2d 702, 100 S.Ct. 2009]; *Hughes* v. *Oklahoma* (1979) 441 U.S. 322 [60 L.Ed.2d 250, 99 S.Ct. 1727].) This juxtaposition is not exclusive however. For example, in *Boston Stock Exchange, supra,* 429 U.S. 318 the court concluded that a state tax statute that discriminated between two classes of interstate commerce (securities sales) was unconstitutional. Despite the rather unique nature of the instant case, the same analysis should apply.

In *Complete Auto Transit, supra,* 430 U.S. 274, the court adopted a four-part test for determining whether a state tax imposed on interstate commerce will survive a commerce clause challenge. Such a tax is constitutional if it ". . . is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided." (*Id.,* at p. 279 [51 L.Ed.2d at p. 331].) Because a *nondiscriminatory* ad valorem personal property tax on business inventories would satisfy each of these requirements (see *Michelin, supra,* 423 U.S. 276) we need focus our inquiry only on the third prong of the test.

The exemption at issue not only removes the inventory of foreign companies transshipping through California from within the scope of the property tax, it exempts domestic companies involved in importing or exporting as well. Star-Kist is a California corporation which transships goods manufactured outside the country through California for sale in other states. To the extent that domestic companies, like Star-Kist, can take advantage of section 225's tax exemption and thereby gain a competitive edge over domestic competitors operating exclusively within the United States, discrimination against a distinct class of interstate commerce is occurring. Thus the tax fails the *Complete Auto Transit* test of constitutionality.

As the *Michelin* court noted, "there is no reason why an importer should not bear his share of [the] costs [of state services] along with his competitors handling only domestic goods." (*Id.,* 423 U.S. 276, 287 [46 L.Ed.2d 495,

---

[13]" 'The very purpose of the Commerce Clause was to create an area of free trade among the several States.' " (*Boston Stock Exchange, supra,* 429 U.S. at p. 328 [50 L.Ed.2d at p. 523].)

504].) Viewing the exemption, as we must, "'. . . in light of its actual effect considered in conjunction with other provisions of the State's tax scheme'" (*Maryland* v. *Louisiana, supra,* 451 U.S. 725, 756 [68 L.Ed.2d 576, 601]), we conclude that the exemption constitutes an undue burden on interstate commerce in violation of the commerce clause.

The judgment is affirmed.

Bird, C. J., Mosk, J., Broussard, J., Grodin, J., and Uchiyama (Mikio), J.,* concurred.

**LUCAS, J.**—I respectfully dissent. Applying improper analysis, the majority incorrectly strikes down as violative of the federal commerce clause (U.S. Const., art. I, § 8, cl. 3) former Revenue and Taxation Code section 225 which provided a tax exemption for business inventory of foreign origin or destination transshipped through California.[1] Although presently all business inventory is exempt from taxation (§ 219) and former section 225 has been repealed (Stats. 1984, ch. 678, § 10, p. 188), I write separately because today's decision improperly precludes the Legislature from future use of this valid device to attract foreign commerce to California ports.

The commerce clause, investing in Congress the power "[t]o regulate commerce with foreign nations, and among the several States . . ." (U.S. Const., art. I, § 8, cl. 3) also acts, by its own force, as a limitation on state power. (*Boston Stock Exchange* v. *State Tax Comm'n* (1977) 429 U.S. 318, 328-329 [50 L.Ed.2d 514, 523-524, 97 S.Ct. 599].) This limitation applies to laws implicating both the foreign and interstate components of the commerce clause, but has never been read as an absolute ban on the states' authority to enact legislation touching upon either the foreign or interstate commerce powers. (*Ibid.; Cooley* v. *Board of Wardens* (1852) 53 U.S. (12 How.) 299, 319 [13 L.Ed. 996, 1004].) As I will demonstrate, the statute at issue here, extending a business inventory exemption to importers and exporters transshipping through California while denying the exemption to interstate shippers, does not violate either of these implicit limitations on state power.

---

*Judge, Fowler-Caruthers Justice Court, assigned by the Chairperson of the Judicial Council.

[1] All further statutory references are to the Revenue and Taxation Code.

I. *Foreign Commerce Clause*

Conceding that nondiscriminatory ad valorem taxes on foreign business inventories would have no impact on the federal government's foreign commerce power (*ante,* p. 13), the majority concludes that the section 225 exemption from this otherwise valid tax may actually offend that power, as it "may operate to nullify the curative effect of federally imposed tariffs." (*Ante,* p. 14.) I submit that such speculation is not sufficient to strike down an otherwise valid exercise of state power.

In *Japan Line, Ltd.* v. *County of Los Angeles* (1979) 441 U.S. 434, 449-450, footnote 14 [60 L.Ed.2d 336, 348-349, 99 S.Ct. 1813], the high court reiterated the three main policies used in federal commerce clause analysis: "'[T]he Federal Government must speak with one voice when regulating commercial relations with foreign governments . . .; import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and harmony among the States might be disturbed unless seaboard States . . . were prohibited from levying taxes on [goods in transit].'" The exemption provided by former section 225 does not conflict with any of these concerns.

In *Container Corp.* v. *Franchise Tax Bd.* (1983) 463 U.S. 159, 193-194 [77 L.Ed.2d 545, 571, 103 S.Ct. 2933], the Supreme Court amplified upon the first policy concern identified in *Japan Line,* inquiring whether the state legislation "impair[s] federal uniformity in an area where federal uniformity is essential" (*Japan Line, supra,* 441 U.S. at p. 448 [60 L.Ed.2d at p. 347]), preventing "the Federal Government from 'speaking with one voice' in international trade . . ." (*id.,* at p. 453 [60 L.Ed.2d at p. 351]). The *Container Corp.* court stated that merely because a state tax has "foreign resonances," it does not necessarily implicate foreign affairs; rather, violation of the "one voice" standard occurs if the state tax "*either* implicates foreign policy issues which must be left to the Federal Government *or* violates a clear federal directive." (*Container Corp., supra,* 463 U.S. at p. 194 [77 L.Ed.2d at pp. 571-572], italics in original.)

*Container Corp.* concerned, in part, whether application of California's "unitary business" principle to tax foreign subsidiaries violated the federal commerce clause. In concluding that the state's tax did not violate the "one voice" standard, the court found that the state tax did not implicate foreign policy by creating a threat of economic retaliation by other nations. Although recognizing foreign policy issues other than economic retaliation could be implicated, the court noted that the absence of an amicus curiae brief by

the Solicitor General raising such concerns, primarily the province of the executive branch and Congress, was some indication that no such other considerations were involved. (*Id.,* at pp. 195-196 [77 L.Ed.2d at p. 571].)

Analyzing whether the tax violated a "clear federal directive," termed "essentially a species of pre-emption analysis," the court observed that the existing tax treaties did not address state taxing powers, the regulation of which Congress had debated but chosen not to regulate. (*Id.,* at pp. 196-197 [77 L.Ed.2d at pp. 573-574].) The court concluded the California tax was thus not "pre-empted by federal law or *fatally* inconsistent with federal policy." (*Id.,* at p. 197 [77 L.Ed.2d at p. 573], italics added.) The same conclusion should be reached regarding the exemption in the present case.

Primarily, the majority has failed to demonstrate how the tax exemption at issue affects any foreign policy. Clearly, the effect of this legislation would not offend our foreign trading partners. Rather, any equivalent "retaliation" by other nations, in the form of tax exemption for United States exports would be welcome. Additionally, we find the views of the Solicitor General as stated in *Sears Roebuck and Co.* v. *County of Los Angeles et al.* (1981) 449 U.S. 1119 [67 L.Ed.2d 106, 101 S.Ct. 933], persuasive evidence that former section 225 has not implicated any other foreign policy matters. In *Sears Roebuck and Co.* v. *County of Los Angeles et al., supra,* 449 U.S. 1119, the Supreme Court reviewed a California Court of Appeal opinion finding former section 225 unconstitutional, and requested the Solicitor General to submit a brief on the matter. Responding to this request, the Solicitor General stated his view that the exemption *did not* violate the commerce clause. Though ultimately the Court of Appeal opinion was summarily affirmed by an equally divided court, the Solicitor General's opinion remains significant to the extent that it serves as an indication that the Executive Branch itself did not perceive former section 225 as interfering with foreign policy. (See *Container Corp., supra,* 463 U.S. at pp. 195-196 [77 L.Ed.2d at pp. 572-573].)

Neither does the challenged exemption violate a clear federal directive. Unlike *Japan Line,* where the court cited the Customs Convention on Containers (441 U.S. at p. 452 [60 L.Ed.2d at p. 350]), a specific directive in conflict with the state's taxing policy, the majority herein presents only the *possibility* that some hypothetical tariff may be impeded by the inventory exemption. Instead, like the situation in *Container Corp.,* there is no indication either that by imposing a tariff, Congress has intended to occupy the field, precluding taxation or exemption, or that allowing the exemption would defeat the purposes of congressional action. Neither the Supreme Court nor Congress has ever required states to impose ad valorem taxes. Absent some concrete showing that the exemption is preempted by federal

law, or "fatally inconsistent with federal policy," I would hold that this seemingly harmless exemption does not impair federal uniformity, preventing the federal government from "speaking with one voice" in international trade.

The exemption also cannot be found to conflict with the other major federal commerce clause concerns. Obviously, providing an exemption does not divert import revenues to the states. Moreover, unlike a tax imposed by a seaboard state which could adversely affect inland states, leading to disharmony, this tax exemption would not lead to interstate rivalry.[2] The tax exemption provided by former section 225 did not violate any of the policies forming the basis of the foreign commerce clause. Rather than impeding the flow of foreign commerce, this exemption, if anything, facilitated this channel of trade.

II. *Interstate Commerce Clause*

Former section 225's exemption also may not be invalidated as interfering with *interstate* commerce. The majority applies the test of *Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 279 [51 L.Ed.2d 326, 331, 97 S.Ct. 1076], which is used to determine whether a state *tax* interferes with interstate commerce, to analyze whether this *exemption* unduly burdens interstate commerce. I submit that the application of *Complete Auto* in this wholly different context is erroneous.

The majority cites no case where *Complete Auto* is used to analyze whether a state tax exemption or credit violates the commerce clause. Moreover, the inappropriateness of applying *Complete Auto* in this context is further demonstrated when one attempts to apply the three parts of its four-part analysis which the majority does not discuss.[3] For example, it seems absurd to say that a state's choice not to impose a tax somehow violates the commerce clause unless the activity not taxed has a substantial nexus to that state. Likewise, it is difficult to imagine what commerce clause policy concerns are promoted by requiring that the exemption be "fairly apportioned" or "fairly related" to the services for which the state has chosen not to tax.

---

[2]As the court noted in *Japan Line,* the concern of preserving harmony among the states requires essentially the same inquiry as whether a state tax interferes with interstate commerce (441 U.S. at p. 449, fn. 14 [60 L.Ed.2d at pp. 348-349]), a matter which we treat more fully *post.* (See *post,* pp. 19-21.)

[3]In *Complete Auto,* the high court stated that a state tax may be sustained "against a Commerce Clause challenge when [1] the tax is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." (430 U.S. at p. 279 [51 L.Ed.2d at p. 331].) The majority discusses only the third prong.

(See *ante,* p. 15.) These various factors relate to the propriety of *taxing* the in-state activity, assuring that the taxes are properly exacted for the services rendered by the state; the test was not designed to determine whether it is proper to *exempt* such property from tax.

The proper inquiry is whether the exemption statute, protecting only imports and exports, burdens the free flow of commerce among the several states. A recent United States Supreme Court case appears controlling. In *Westinghouse Electric Corp.* v. *Tully* (1984) 466 U.S. 388 [80 L.Ed.2d 388, 104 S.Ct. 1856], the State of New York, responding to federal tax legislation affecting "Domestic International Sales Corporations" (DISC), restructured its procedures for taxing distributions received by a parent corporation from its subsidiary. It also provided in part for a "partially offsetting tax credit," applied to DISC income from export products "shipped from a regular place of business of the taxpayer within [New York]." (*Id.,* at p. 393 [80 L.Ed.2d at p. 394].) The amount of the credit, applied to the parent corporation's tax obligation for business activity conducted in New York, was dependent not only on the amount of goods the DISC shipped from New York, but also upon the percentage of the DISC's shipping activity conducted in New York vis-à-vis other states.[4] Parent corporations with identical business allocation percentages (the percentage of its total business activity conducted in New York), and identical New York DISC income were taxed differently depending upon the amount of DISC income derived from shipping activities in other states. (*Id.,* at pp. 400-402, fn. 9 [80 L.Ed.2d at pp. 398-400].)

In analyzing whether "the method of allowing the credit is *discriminatory in a manner that violates the Commerce Clause . . .*" (*id.,* at p. 399 [80 L.Ed.2d at p. 398], italics added), the court focused on the fact that "not only does the New York tax scheme 'provide a positive incentive for increased business activity in New York State' . . . it [*also*] *penalizes* increases in the DISC's shipping activities in other States." (*Id.,* at pp. 400-401 [80 L.Ed.2d at p. 398].) The court also reiterated the settled principles that " " "[t]he very purpose of the Commerce Clause was to create an area of free trade among the several States" " " (*id.,* at p. 402 [80 L.Ed.2d at p. 400]), and that " '[n]o State, consistent with the Commerce Clause, may "impose a tax which discriminates against interstate commerce . . . by providing a

[4]Though computed according to a five-step formula (*id.,* at pp. 393-394 [80 L.Ed.2d at pp. 394-395]), the amount of the credit was, in essence, dependent upon the DISC's "export ratio." In other words, the credit otherwise applied to the New York DISC revenues attributable to the parent was further multiplied by the quotient derived from dividing DISC's New York gross receipts by the DISC's total gross receipts.

direct commercial advantage to local business.""'" (*Id.*, at p. 403 [80 L.Ed.2d at p. 400].)

Acknowledging that in each case the court must balance the national interest in free trade with the state's interest in exercising its taxing powers (*id.*, at p. 403), the court found the principles enunciated in *Boston Stock Exchange, supra,* and *Maryland* v. *Louisiana* (1981) 451 U.S. 725 [68 L.Ed.2d 576, 101 S.Ct. 2114], controlling.[5] In both cases, the court struck down state statutes imposing greater economic burdens on similar activities occurring out-of-state than occurring in-state. The court concluded that the New York tax credit violated the commerce clause because it "'foreclose[d] tax-neutral decisions and . . . create[d] . . . an advantage' for firms operating in New York *by placing 'a discriminatory burden on commerce to its sister States.'* [Citation.]" (*Westinghouse Electric, supra,* 466 U.S. at p. 406 [80 L.Ed.2d at p. 402], italics added.)[6]

Nonetheless, the *Westinghouse Electric* court hastened to add that not all schemes to attract a particular segment of industry into a state are unconstitutional. The court stated: "We reiterate that it is not the provision of the credit that offends the Commerce Clause, but the fact that it is allowed on an impermissible basis, i.e., the percentage of a specific segment of the corporation's business that is conducted in New York. As in *Boston Stock Exchange,* we do not 'hold that a State may not compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy. *We hold only that in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State.'*" (*Id.*, at pp. 406-407, fn. 12 [80 L.Ed.2d at p. 403], italics added.)

The tax exemption granted by former section 225 to attract commerce to California ports was not grounded on an "impermissible basis." There was

---

[5]In *Maryland* v. *Louisiana, supra,* the court struck down Louisiana's "First-Use" tax statute, imposing a tax on natural gas brought into the state, while providing exemptions and credits to local users, as "unquestionably discriminating against interstate commerce in favor of local interests." (*Id.*, at p. 756 [68 L.Ed.2d at p. 602].) Likewise in *Boston Stock Exchange, supra,* the court found violative of the commerce clause a stock transfer tax reducing the tax burden on nonresidents engaged in in-state (but not out-of-state) sales of stock, and creating a maximum tax limit for all stock buyers for purchases made in-state (but not out-of-state). The court found the tax unconstitutional because it "discriminates between two types of interstate transactions *in order to favor local commercial interests over out-of-state businesses . . .*" (*id.*, at p. 335 [50 L.Ed.2d at p. 528], italics added), concluding that a state may not build up its own commerce by burdening businesses in other states. (*Ibid.*)

[6]Significantly, the court did not cite or apply *Complete Auto* in either *Westinghouse Electric* or *Maryland* v. *Louisiana, supra.*

no penalty imposed on activity conducted outside of California. Shippers not wishing to pay the inventory tax, levied as a quid pro quo for the services rendered by California, simply may have chosen to transship through another state. Unlike *Boston Stock Exchange, Westinghouse Electric,* and *Maryland v. Louisiana, supra,* no burden was imposed on interstate commerce by placing a penalty or disincentive on the choice to transact business in another state. Moreover, unlike the paradigm commerce clause case, local interests are not favored. (See *Westinghouse Electric, supra,* 466 U.S. at p. 403 [80 L.Ed.2d at p. 400].) The exemption is available regardless of the residency of the shipper or the place of manufacture of the goods, with the exception of those goods whose point of origin is California which do not qualify for the exemption because they are not being "transshipped" *through* California.

In my view, respondents' claim at bottom is really an equal protection attack. They are complaining in essence that the state's differential treatment of import and export business inventories from that of domestic goods lacks a rational basis. Assuming respondents would have standing to raise this issue, an unlikely conclusion under the majority's analysis (see *ante,* p. 6), I submit that former section 225 would be upheld against such a challenge because the distinction it draws "'is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy . . . .'" (*Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 527 [3 L.Ed.2d 480, 485, 79 S.Ct. 437] [upholding against an equal protection clause challenge an Ohio statute providing only *nonresidents* an exemption for merchandise held in storage, from a tax otherwise imposed on "[a]ll personal property located and used in business in the state"].)

One such reasonable policy consideration may be the greater threat of business flight from California posed by importers and exporters rather than by those dealing in interstate commerce, which justifies a greater incentive for the former group. (See *Zee Toys, Inc.* v. *County of Los Angeles* (1978) 85 Cal.App.3d 763, 776 [149 Cal.Rptr. 750].) In any event, the Legislature was not required to expressly state these policy considerations. The statute would not violate the equal protection clause "if any state of facts reasonably can be conceived that would sustain it. [Citations.]" (*Allied Stores, supra,* 358 U.S. at p. 528 [3 L.Ed.2d at p. 486].)

The exemption provided by former section 225 does not run contrary to the limitations on state power implicit in either the foreign or interstate components of the commerce clause. The exemption neither interferes with the federal government's ability to speak with one voice when regulating commercial relations with foreign governments, nor does it burden the free flow of interstate commerce by imposing a penalty on business activity

conducted outside of California. I would find the tax exemption constitutional and would reverse the trial court's ruling denying plaintiff's claim for a refund of the improperly levied inventory tax.

Appellant's petition for a rehearing was denied August 28, 1986. Lucas, J., was of the opinion that the petition should be granted.